Luvinia ALEXANDER, for herself and as guardian ad litum for Sharifa Alexander, Sylvia Bey, for herself and as guardian ad litum for Trustin Bey, Irene Burkett, for herself and as guardian ad litum for Robert Burkett, Andrea Carey, for herself and as guardian ad litum for Leslie Bonita Rex, Sheila Mitchell, for herself and as guardian ad litum for Tamika Mitchell, Elizabeth Truitt, for herself and as guardian ad litum for Leon Truitt

v.

Louis POLK, M.D., Acting Director of the Philadelphia Department of Health, Individually and in his official capacity, Pearl Pitt, M.D., WIC Coordinator Division of Maternal and Child Health, Philadelphia Department of Health, Individually and in her official capacity, David Soricelli, D.D.S., Director of Community Health Services, Individually and in his official capacity, Christine Kniszley, M.D., Director of Maternal and Child Health Programs, Individually and in her official capacity, Barry Dickman, Administrator of the WIC Program, Individually and in his official capacity, Jack Burkhardt, Administrator of the Division of Maternal and Child Health of the Philadelphia Department of Health, Individually and in his official capacity, the Department of Health of the City of Philadelphia.

Civ. A. No. 78–2594.

United States District Court,
E. D. Pennsylvania.

Oct. 31, 1978.

Gregory E. Lucyk, Suzanne Reilly, Community Legal Services, Philadelphia, Pa., for plaintiffs.

James M. Penny, Jr., Asst. City Sol., Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

This action challenges the administration of the Supplemental Food Program for Women, Infants, and Children (WIC), 42 U.S.C. § 1786 (Supp. V 1975), by the Philadelphia Department of Public Health (City). The plaintiffs are six women whose children had been participants in the Philadelphia WIC program. They allege that the City wrongfully terminated their children's benefits in violation of the statute, the regulations promulgated thereunder, and the Constitution. In addition to injunctive and declaratory relief, the plaintiffs pray for punitive damages in excess of $10,000 against each of the named defendants, including the city agency and its director, the administrator and the coordinator of the City's WIC program, the director and the administrator of the Division of Maternal and Child Health, and the director of the Community Health Services.

Before me is plaintiffs' motion for a preliminary injunction. Following a hearing on August 8, 1978, plaintiffs and the City entered into a stipulation which might have effectively disposed of plaintiffs' complaint except that the agreement reached by the immediate parties was contingent upon modification of an existing contract between the City and the Pennsylvania Department of Health (Department). As the City and the Department failed to reach a satisfactory accord, the hearing resumed on September 5. For the reasons stated below, I will deny the motion for preliminary injunction.

Congress enacted the special supplemental food program in 1972 as an amendment to the Child Nutrition Act of 1966. Pub. L.No. 92–433, § 9, 86 Stat. 729–31 (1972) (current version at 42 U.S.C. § 1786 (Supp. V 1975)) (amending 42 U.S.C. § 1771 et seq. (1970)).[1] Recognizing that a substantial number of pregnant women, infants, and young children faced a special health risk because of inadequate nutrition, Congress sought to ameliorate that risk by providing free nutritious foods to supplement the diets of program participants. 42 U.S.C. § 1786(a) (Supp. V 1975). Entirely federally-funded, the WIC program is administered by the Food and Nutrition Service (FNS) of the United States Department of Agriculture (USDA). Id. § 1786(b); 7 C.F.R. §§ 246.1(a), .3(a) (1978). The legislation empowers the Secretary of Agriculture to make cash grants to the health agencies of states choosing to participate. The state, in turn, contracts with local agencies in areas with needy populations to effectuate the delivery of program benefits to eligible recipients. 42 U.S.C. § 1786(b) (Supp. V 1975); 7 C.F.R. §§ 246.1(b), .3, .4 (1978). Prospective participants must reside in the area or belong to the population served by the local agency, must meet the income criteria set by the state agency, and must be determined to be in nutritional need by a competent professional authority.[2] 42

---

1. As originally enacted, the special supplemental food program was funded through September 30, 1978. The 1978 Amendments to the Child Nutrition Act substantially revise the program and provide funding through September 30, 1982. S. 3085, 95th Cong., 2d Sess. § 3, 124 Cong.Rec. S19211–13, H13514–17 (daily ed. Oct. 14, 1978). As of the date of this opinion, both the Senate and the House had passed S.3085, and the bill was awaiting the President's signature.

2. The statute defines competent professional authority to include "physicians, nutritionists, registered nurses, dietitians, or State or local medically trained health officials, or persons designated by physicians or State or local medically trained health officials as being competent professionally to evaluate nutritional risk." 42 U.S.C. § 1786(g)(4) (Supp. V 1975). The regulation setting forth the definition tracks the statute, changing "nutritional risk" to "nutritional need" and adding the phrase

U.S.C. § 1786(b)(1), (e) (Supp. V 1975); 7 C.F.R. § 246.7(a)(2), (b) (1978). In order to provide the local agencies with an equitable and effective means of distributing the allocated funds, 42 Fed.Reg. 43205, 43208 (1977), the regulations enumerate six categories of nutritional need, in descending order of priority,[3] to be implemented when a program reaches its maximum participation level. 7 C.F.R. § 246.7(b)(2)(ii) (1978).

In Pennsylvania, the Department is the agency charged with state-wide administration of the WIC program, and the City, by virtue of its contract with the Department, dispenses benefits locally. N.T. 16–17 (Aug. 8, 1978);[4] Defendants' Exhibit No. 2. The City operates its program as an adjunct to a health care program and utilizes both its own district health centers and, by subcontract, independent health facilities. N.T. 109 (Aug. 8, 1978); N.T. 26 (Sept. 5, 1978).[5] A potential WIC recipient[6] undergoes a health assessment by a competent professional authority,[7] who evaluates the applicant's nutritional status and makes the determination of eligibility. N.T. 110 (Aug. 8, 1978); N.T. 57–59 (Sept. 5, 1978). The certified WIC recipient then receives a prescription[8] for the appropriate food package.[9] N.T. 110 (Aug. 8, 1978). The prescription is in the form of a voucher, to which is attached a check drawn on the Commonwealth's account. N.T. 111 (Aug. 8, 1978); Defendants' Exhibit No. 5. The recipient designates, from the list of vendors who have agreed with the City to

"and to authorize supplemental foods" at the end of the paragraph. 7 C.F.R. § 246.2 (1978).

3. The regulations provide for application of the following priorities to assure that persons in greatest nutritional need receive benefits first:

"(A) *Priority I.* Pregnant women, breastfeeding women and infants in nutritional need as demonstrated by hematological or anthropometric measurements, or other documented medical conditions which demonstrate the person's need for supplemental foods.

(B) *Priority II.* Infants (up to 6 months of age) of WIC recipients who participated during pregnancy, except for infants who qualify for Priority I.

(C) *Priority III.* Children in nutritional need as demonstrated by hematological or anthropometric measurements or other documented medical conditions which demonstrate the child's need for supplemental foods.

(D) *Priority IV.* Pregnant women, breastfeeding women, and infants in nutritional need because of an inadequate dietary pattern, as documented by a person qualified in such assessments.

(E) *Priority V.* Children in nutritional need because of an inadequate dietary pattern, as documented by a person qualified in such assessments.

(F) *Priority VI.* Postpartum women in nutritional need."

7 C.F.R. § 246.7(b)(2)(ii)(A)–(F) (1978).

4. Hearings on the motion took place on August 8 and September 5. Because the transcripts are not consecutively paginated, I have included the hearing date in citations to the transcripts throughout the opinion in order to avoid confusion.

5. There are 11 city health centers and 18 subcontracting facilities, which include hospitals, clinics, and neighborhood health centers. N.T. 109 (Aug. 8, 1978); *see* Defendants' Exhibit No. 3.

6. *See* 42 U.S.C. § 1786(b)(1), (g)(1)–(2) (Supp. V 1975) (defines target of legislation as pregnant and lactating women and infants determined to be at nutritional risk).

7. In the Philadelphia program, a health assessment entails an evaluation of the height, weight, and head circumference measurements as well as of hemoglobin and hematocrit readings. N.T. 18, 57–59 (Sept. 5, 1978). The City numbers among its competent professional authorities physicians, registered nurses, nutritionists, and nutrition aides. N.T. 134 (Aug. 8, 1978).

8. Participants in the WIC program do not receive money outright. Instead, they are issued vouchers for specific foods in quantities tailored to individual needs. The vouchers may be exchanged only for the food prescribed. N.T. at 110–12 (Aug. 8, 1978). In Philadelphia, the value of the monthly benefits to a recipient averaged $17.85. N.T. 14–16 (Sept. 5, 1978).

9. Because the nutritional requirements of the participants vary, the regulations outline three food packages—one for infants, a second for children and pregnant, breastfeeding, and postpartum women, and a third for children with special dietary needs. 7 C.F.R. § 246.8(d) (1978). From this list of authorized foods, the competent professional authority then prescribes the particular foods and quantities to meet the individual recipient's nutritional needs. *Id.* § 246.8(c).

supply the required foods at a specific price, the grocery store at which she will exchange the voucher for the food prescribed. N.T. 110–12 (Aug. 8, 1978). The recipient has thirty days from issuance to cash in the voucher, and the vendor then has sixty days [10] from the expiration date of the voucher to present the check for payment. 7 C.F.R. § 247.10(d)(3) (1978). The checks paid in a given month are reported through the state's data processing system to the Department, which relays that information to the local agency. N.T. 17–19 (Aug. 8, 1978).

The contract between the City and the Department limits the City's WIC program food expenditures to $300,000 per month, with a ceiling of $2,700,000 for the short fiscal year, which ran from October 1, 1977 to June 30, 1978.[11] Defendants' Exhibit No. 2, ¶ 1, at 1; id. ¶ 20, at 6. In addition, the contract imposes a limit on the City's administrative costs; reimbursement for these expenses is based on the number of food vouchers issued and is limited to approximately 12% of the food costs.[12] Id. ¶ 19, at 6. The contract recommends a monthly caseload of 15,000 recipients, with the caveat that should program participation reach caseload without maximum expenditure, the agency should accommodate more people up to the budgetary limit. Id. ¶ 2, at 1. The City's contract with the independent health care facilities tracks the City's contract with the Department with respect to duration and provides for reimbursement of the facilities' actual personnel expenses up to a maximum of 8% of the value of food vouchers issued during the monthly reporting period.[13] Defendants' Exhibit No. 3, ¶ 9, at 3; id. ¶ 3, at 2.

In November 1977, the City conducted a head count of program participants, which revealed that the City's caseload was approximately 19,000. N.T. 117 (Aug. 8, 1978); N.T. 11 (Sept. 5, 1978). Fearing that its budget would be exhausted before the end of the contract period, the City decided to implement the priority system. N.T. 117, 120–24, 137–38 (Aug. 8, 1978). In a memo dated December 20, 1977, addressed to the district health directors and nursing and clerical supervisors, Dr. Pearl Pitt, the City WIC coordinator, directed not only that certification of postpartum women and children who had reached age four be discontinued but also that these categories of recipients be removed from the program. Defendants' Exhibit No. 8. On December 30, 1977, Dr. Pitt similarly instructed the directors of the independent health care facilities to remove from the program postpartum women and children over four years of age with no medical problems; she also limited the permissible caseload of each facility. Defendants' Exhibit No. 9 to 19. When those WIC recipients designated for removal next appeared to obtain their vouchers, they were informed that they were to be removed from the program; they were, however, issued a food prescription at that time. N.T. 64 (Sept. 5, 1978). The City concedes that at the time of removal, plaintiffs received neither written notice of the reasons for the action nor an opportunity for a hearing. N.T. 13, 149 (Aug. 8, 1978).

Plaintiffs challenge the City's implementation of the priority system on several grounds. First, they allege that the categorical removals deprived plaintiffs of their

---

10. It is unclear from the testimony of Mary Ann Britton, the State WIC coordinator, whether a vendor is permitted 30 or 60 days in which to redeem the voucher. See N.T. 18 (Aug. 8, 1978). The regulations specifically require that the vendor receive 60 days from the expiration date of the food instrument to present the check. 7 C.F.R. § 246.10(d)(3)(iii) (1978); 42 Fed.Reg. 43205, 43210–11 (1977).

11. The expiration of the contract does not moot the crucial question of the City's prerogative, under the regulatory scheme, to implement the

priorities, nor does it affect plaintiffs' claim that their removals without notice and hearing violated the regulations, the statute, and the Constitution.

12. The actual dollar limit on administrative costs was $371,250 for the contract period or $41,250 per month.

13. The dollar limit on the subcontractors' administrative costs was $96,265. Defendants' Exhibit No. 3, ¶ 10, at 3.

right under section 1786(e) to have their eligibility individually determined by a competent professional authority. Second, they argue that the City's action contravenes the regulations promulgated by the FNS under section 1786 in several respects. They contend that the City was powerless, absent an express directive from the state, to implement the priority system; that the City program was not at maximum capacity and circumstances did not thus necessitate the City's action; and finally, that the manner of implementation, specifically, the removal of the four-year-old children, created a priority within a priority that is inconsistent with the regulations. They also contend that the regulations require the City to provide not only written notice prior to the termination of benefits, stating the reasons therefor and advising of the availability of a hearing, but also a pretermination evidentiary hearing. Third, plaintiffs allege that the City's action implicates the due process clause of the fourteenth amendment. They argue that the across-the-board removal of four-year-olds creates an irrebuttable presumption and that the City's failure both to afford an individualized determination and to implement the fair hearing procedure outlined in the regulations deprives plaintiffs of a protected interest without due process. They seek to preliminarily enjoin the defendants' continued adherence to the priorities system as well as the continued denial of the notice and fair hearing requirements.

## I. Subject Matter Jurisdiction

Plaintiffs allege 28 U.S.C. §§ 1331, 1343(3)–(4), and 1337 (1976) as their jurisdictional bases. In their answer, defendants assert as an affirmative defense the lack of subject matter jurisdiction with respect to each jurisdictional allegation. I must therefore address the question of subject matter jurisdiction before proceeding to the merits of plaintiffs' motion for preliminary injunction.

### Section 1331

To ground jurisdiction on 28 U.S.C. § 1331(a) (1976), plaintiffs must meet a two-pronged test: the matter in controversy must arise under the Constitution, laws, or treaties of the United States and the value of the claim must exceed $10,000. For section 1331 purposes, a case "arises under" if "the complaint seeks a remedy expressly granted by a federal law or if it requires the construction of a federal statute [or the Constitution] or a distinctive policy of a federal statute requires the application of federal legal principles for its disposition." *Lindy v. Lynn,* 501 F.2d 1367, 1369 (3d Cir. 1974). Plaintiffs' complaint satisfies this standard on several points. Their allegation that defendants have categorically terminated the benefits of statutorily-defined eligible recipients without notice or the opportunity for a hearing raises the question whether plaintiffs' interest rises to the level of a constitutionally-protected entitlement. This clearly implicates the procedural due process guarantee of the fourteenth amendment. They also allege that defendants' action contravenes section 1786, which secures to plaintiffs the right to have their eligibility for the WIC program individually determined by a competent professional authority. Finally, they assert that defendants ignored the fair hearing procedures outlined in the regulations authorized by and issued pursuant to section 17 of the Child Nutrition Act, 42 U.S.C. § 1786 (Supp. V 1975).

Although the availability of an implied remedy both under the fourteenth amendment and under the Child Nutrition Act is questionable, that hurdle does not prevent this court from assuming jurisdiction over the controversy. As the courts have often—and emphatically—reiterated, the question whether a court has subject matter jurisdiction differs analytically from the question whether plaintiff has stated a viable cause of action. *E. g., Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Mahone v. Waddle,* 564 F.2d 1018, 1022 (3d Cir. 1977); *Payne v. Government of the District of Columbia,* 182 U.S. App.D.C. 188, 193–95, 559 F.2d 809, 814–16 (1977); *see Santora v. Civil Service Com-*

*mission, City of New York,* 443 F.Supp. 25, 28–29 (S.D.N.Y.1977); *Cave v. Beame,* 433 F.Supp. 172, 174–76 (E.D.N.Y.1977); *cf. Pitrone v. Mercadante,* 572 F.2d 98, 100 (3d Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978). The latter is a question of law, which must be decided after the court assumes jurisdiction and which calls for judgment on the merits. *Bell v. Hood, supra,* 327 U.S. at 682, 66 S.Ct. 773. The former, however, requires an examination of the allegations in the complaint to determine if construction of the Constitution or federal laws will dictate the plaintiff's right to recover. If the federal Constitution or laws directly impact upon the plaintiff's claim and the complaint appears to be neither "immaterial and made solely for the purpose of obtaining jurisdiction" nor "wholly insubstantial and frivolous," the district court acquires jurisdiction under section 1331(a). *Bell v. Hood, supra,* 327 U.S. at 682–83, 66 S.Ct. at 776. Plaintiffs' complaint meets that standard.

■■ In addition, although not pleaded specifically as a source of section 1331 jurisdiction, 42 U.S.C. § 1983 (1970) provides yet another peg for federal question jurisdiction. By its terms, section 1983 not only subsumes plaintiffs' constitutional and statutory claims but also supplies the remedial vehicle for their vindication.[14] *See National Land & Investment Co. v. Specter,* 428 F.2d 91, 98–100 (3d Cir. 1970). Furthermore, inasmuch as *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690–695, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), has redefined "person[s]" amenable to suit under section 1983 to encompass local governmental units and agencies imple-

menting official policy, all of the named plaintiffs in this action, the City included,[15] come within the ambit of the court's jurisdiction.

■ The foregoing discussion demonstrates that plaintiffs' complaint fully satisfies the first prong of the test for federal question jurisdiction. Compliance with the amount-in-controversy requirement, however, poses a much closer and more difficult question that is not as easily resolved. Plaintiffs here contrive to meet the jurisdictional minimum by praying only for punitive damages in excess of $10,000 against each of the seven named defendants. Normally, a plaintiff's allegation of damages will suffice if it is made in good faith and unless it appears to a legal certainty that the claim is really for less than the jurisdictional minimum. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938), *quoted in Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 276, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *accord, Lister v. Commissioners Court, Navarro County,* 566 F.2d 490, 492 (5th Cir. 1978); *Payne v. Government of the District of Columbia, supra,* 182 U.S.App.D.C. at 199, 559 F.2d at 820; *Spock v. David,* 469 F.2d 1047, 1050 (3d Cir. 1972); *Davis v. Shultz,* 453 F.2d 497, 501 (3d Cir. 1971).

■ It is well-settled that federal law permits the recovery of punitive damages, and plaintiffs may look to punitive damages to reach the jurisdictional amount. *See, e. g., Cochetti v. Desmond,* 572 F.2d 102, 105 (3d Cir. 1978) (quoting *Hague v. CIO,* 101 F.2d 774, 789 (3d Cir.), *modified on other*

---

14. Section 1983 provides that
 "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

15. Because the Philadelphia Department of Public Health is a municipal agency, there are

no eleventh amendment obstacles to suit. *See, Monell v. New York City Dep't of Social Serv.,* 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 279–80, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Furthermore, the decision to remove the Priority VI women and Priority V four-year-olds was a manifestation of city policy in that it was based upon consideration of the City's potential liability on its contracts with both the state and the independent health facilities.

*grounds,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)); *Hanna v. Drobnick,* 514 F.2d 393, 398 (6th Cir. 1975); *Basista v. Weir,* 340 F.2d 74, 86–88 (3d Cir. 1965); *Butler v. United States,* 365 F.Supp. 1035, 1040 (D.Hawaii 1973); *cf. United States ex rel. Jones v. Rundle,* 453 F.2d 147, 150–51 (3d Cir. 1971); *Kahermanes v. Marchese,* 361 F.Supp. 168, 172–73 (E.D.Pa.1973). When, however, as here, the amount alleged to be in controversy consists entirely of punitive damages, the probability that the claim is merely colorable and beyond a reasonable expectation of recovery increases. *Compare* 1 Moore's Federal Practice ¶ 0.93[3], at 890–94 (2d ed. 1948) *with id.* ¶ 0.93[4], at 897. Total reliance upon punitive damages therefore raises a serious question whether plaintiffs have pleaded the jurisdictional amount in good faith and I must exercise considerable circumspection in scrutinizing the complaint. *See Zahn v. International Paper Co.,* 469 F.2d 1033, 1033–34 n.1 (2d Cir. 1972), *aff'd,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *cf. Hanna v. Drobnick, supra,* 514 F.2d at 398–99.

The Court of Appeals for the Third Circuit has recently articulated the test applicable to an award of punitive damages. In *Cochetti v. Desmond, supra,* 572 F.2d at 105, the court restated the proposition that punitive damages may be awarded in civil rights cases. Although approving the utility of punitive damages as a deterrent, the court nevertheless limited the appropriate circumstances for such an award to those cases in which "the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Id.* at 106. The test requires that the defendant have acted with "actual knowledge that he was violating a federally-protected right or with reckless disregard of whether he was doing so." *Id.*

▮▮▮▮ Plaintiffs' allegation that "[d]efendants know or should know that the United States Constitution, the Child Nutrition Act, and the regulations . . . required them to provide applicants and recipients with written notice and fair hearings," Complaint ¶ 48, is conclusory and falls short of the Third Circuit's standard for recovering punitive damages. Similarly, plaintiffs' assertion that defendants acted "deliberately, wilfully and maliciously," *id.,* is equally conclusory. It appears from the face of the complaint that none of the plaintiffs, with the exception of Andrea Carey, will recover the jurisdictional minimum.[16]

▮▮▮ When a plaintiff's allegation of damages is controverted either by the court or by the defendant, the burden shifts to the plaintiff to show that the likelihood of recovering less than the jurisdictional minimum is not legally certain. *See Lister v. Commissioners Court, Navarro County, supra,* 566 F.2d at 492–93; *Davis v. Shultz, supra,* 453 F.2d at 501. Normally, I would afford these plaintiffs the opportunity to make such a showing. In this instance, however, that is unnecessary because plaintiffs have an alternative basis of jurisdiction.

16. Plaintiff Carey alleges that Defendant Dickman, the local WIC administrator, terminated her child's benefits because Ms. Carey allegedly used abusive language to a supermarket clerk. She also states that Defendant Burkhardt, the administrator of the Division of Maternal and Child Health, refused an order from the state WIC coordinator to reinstate the child. I cannot say, to a legal certainty, that these allegations if proved would not support a recovery for the jurisdictional amount; Ms. Carey therefore meets the requisites of section 1331 jurisdiction.

The same conclusion does not obtain with respect to the remaining plaintiffs, who must each meet the jurisdictional minimum. *See Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). Other than the aforementioned general and conclusory allegations in the damages clause, these plaintiffs have alleged simply that the defendants failed to provide them with written notice and an opportunity to be heard. If proved, these facts would demonstrate nothing more than a "bare violation," certainly not conduct that would justify an award of punitive damages. If they are successful, plaintiffs would be entitled only to injunctive relief and nominal damages. *See Carey v. Piphus,* 435 U.S. 247, 264 67, 98 S.Ct. 1042, 1052-1054, 55 L.Ed.2d 252 (1978). An award of nominal damages would not approach the jurisdictional minimum. It therefore appears that the remaining plaintiffs cannot satisfy the jurisdictional minimum on the facts alleged in their complaint.

*Section 1343(3)*

Plaintiffs also predicate jurisdiction on 28 U.S.C. § 1343(3) (1976).[17] Because section 1343 requires no minimum amount in controversy, it has provided the principal jurisdictional basis for section 1983 claims. As I have previously noted, plaintiffs' section 1983 claim comprehends both their constitutional and their statutory claims. Whether both aspects of a section 1983 claim come within section 1343(3) jurisdiction is a question raised but left open by the Supreme Court in *Hagans v. Lavine,* 415 U.S. 528, 533–35 n. 5, 94 S.Ct. 1372, 1377, 1378, 39 L. Ed.2d 577 (1974).

Recently addressing that issue in *Gonzalez v. Young,* 560 F.2d 160 (3d Cir. 1977), *cert. granted,* 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978), a case dealing with a conflict between state and federal statutes and regulations, the Third Circuit Court of Appeals held that sections 1343(3) and 1983 are not coextensive. The court concluded that although section 1343(3) provides the jurisdictional basis for section 1983 claims of constitutional dimensions, only those statutory claims alleging a violation of an "Act of Congress providing for equal rights of citizens" come within section 1343(3)'s jurisdictional umbrella. *Id.* at 166–67. Inasmuch as the court refused to characterize section 1983 as an act "providing for equal rights," statutory section 1983 claims, other than those based upon violations of the equal rights acts, are not independently cognizable under section 1343(3).[18]

Consistent with *Hagans v. Lavine,* the Third Circuit approved the exercise of pendent jurisdiction over statutorily-based section 1983 claims where the court's jurisdiction under section 1343(3) rests upon a substantial constitutional claim. *Gonzalez v.*

*Young, supra,* 560 F.2d at 168–69. The *Hagans v. Lavine* test precludes the court from assuming jurisdiction only if the claim is "obviously without merit" or if previous decisions foreclose the subject and leave no room for the inference that the question raised presents a controversy. 415 U.S. at 536–39, 94 S.Ct. 1372.

■■■ As I indicated in the discussion of jurisdiction under section 1331, these plaintiffs have clearly presented a substantial constitutional claim. They aver that the City terminated their WIC benefits without providing written notice or affording an opportunity for a hearing. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and its progeny have secured to welfare recipients the fourteenth amendment protection of procedural due process in certain circumstances. Adjudication of this claim will require not only application of those constitutional principles to determine if these facts warrant a similar result but also inquiry into the impact of the later decisions in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), and *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), which have refined and limited the definition of a constitutionally-protected interest. These issues obviously present a live controversy of sufficient magnitude to support section 1343(3) jurisdiction of plaintiffs' constitutionally based section 1983 claim. I may, therefore, entertain as a matter of pendent jurisdiction plaintiffs' claim that the City's action conflicts with the federal statutory and regulatory scheme. *See Hagans v. Lavine, supra,* 415 U.S. at 536, 94 S.Ct. 1372. Having determined that this matter is properly before me, I need discuss neither sec-

---

**17.** Section 1343(3) provides the district court with original jurisdiction over civil actions brought

"[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . ."

**18.** The Third Circuit also rejected the contention that conflict between federal and state law violates rights secured by the Supremacy Clause. *Gonzalez v. Young,* 560 F.2d 160, 164–66 (3d Cir. 1977) (quoting *Andrews v. Maher,* 525 F.2d 113, 118–19 (2d Cir. 1975)) (such a contention "transforms statutory claims into constitutional claims by verbal legerdemain"), *cert. granted,* 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978).

tion 1343(4), which has been effectively foreclosed by *Gonzalez v. Young, supra,* 560 F.2d at 167–68, nor section 1337.

## II. The Motion for Preliminary Injunction

[15, 16] Plaintiffs request a preliminary injunction to prevent both the continued implementation of the priorities and the continued denial of benefits to the four-year-old children who have been removed from the program. In recasting the traditional standard for preliminary injunctive relief, the Third Circuit Court of Appeals has consistently directed the district court's inquiry to four factors. The burden of showing imminent irreparable injury and a reasonable probability of success on the merits remains with the plaintiff. The district court, however, must also consider both the public interest and the possibility of harm to other interested persons where such considerations are relevant. *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir. 1978). As the court of appeals has cautioned, no single factor is necessarily determinative of the outcome. Rather, the decision to grant or deny preliminary relief requires a "delicate balancing" of all the elements within this framework. *Id.* at 815.

### Irreparable Injury

Congress, in enacting the WIC program, and the City, in certifying these children for benefits, have determined that they face a special nutritional risk. I do not question the detrimental impact of defendants' action upon these children. Nevertheless, I must ascertain whether these four-year-olds will suffer irreparable injury if not immediately reinstated. *See United States v. Pennsylvania,* 533 F.2d 107, 110 (3d Cir. 1976) ("mere injury even if serious or substantial, is not sufficient").

Although the pecuniary value of the denied benefits is slight, *see* N.T. 14–16 (Sept. 5, 1978) (monthly benefits average $17.85), the adverse effect of even a slight reduction in assistance magnifies when the recipient is at the poverty level, as are these plaintiffs. Nevertheless, because WIC is a supplemental program, plaintiffs do not face the possibility of being totally deprived of food. Therefore, I cannot say that the economic consequence in this instance rises to the level of irreparable injury to justify the grant of injunctive relief.

Monetary loss is, however, merely one yardstick by which to gauge the degree of harm. The WIC program does not provide a simple income supplement. Rather, it is structured to ensure the delivery of supplementary nutritious foods to those upon whom the consequences of inadequate nutrition impact most severely.[19]

Plaintiffs' motion catalogues several dire consequences of inadequate nutrition, including mental retardation, permanent loss of I.Q., digestive disorders, anemia, and susceptibility to infectious diseases. Plaintiffs' Motion for Preliminary Injunction ¶ 4. They have, however, failed to persuade me that these children who are allegedly in Priority Group V—that is, certified for WIC not because they exhibit medical or clinical indicators of nutritional need but because of inadequate dietary pattern—stand in imminent danger of suffering these or similarly severe impairments. Apart from the affidavit of a registered dietitian who maintains that an adequate diet is crucial between ages three and five, *see* Affidavit of Margaret Kornblueh (July 27, 1978), *appended to* Plaintiffs' Motion for Preliminary Injunction (filed Aug. 1, 1978), I find it difficult to glean from this record evi-

---

19. At the hearing on August 8, defendants attempted *to counter* the assertion of irreparable injury with a showing that notwithstanding the lack of WIC benefits, the plaintiffs incorporated nutritious foods into their children's diets. In response to questions from defendants' attorney, each of the plaintiffs who testified acknowledged that she understood not only which foods were essential to good nutrition but also which foods her child required. Plaintiffs' appreciation of their children's need for those foods does not, however, mean that they can afford to purchase those same foods on a regular basis. Therefore, for the purposes of determining whether these children will suffer irreparable injury, I have assumed that their removal from WIC effectively deprived them of a regular nutritious supplement to their diets.

dence tending to show that all of these children will, or are even likely to, suffer imminent irreparable injury. Indeed, with one exception, the evidence supports the opposite conclusion. *See* N.T. 139–41 (Aug. 8, 1978) (testimony of Dr. Pitt that it is unlikely children in Priority Group V will suffer consequences alleged unless all food is completely withdrawn).

■ Leon Truitt, the child of plaintiff Elizabeth Truitt, is the exception. Leon was removed from the WIC program in April 1978. N.T. 81 (Sept. 5, 1978). Although he had previously demonstrated an anemic condition, he was at the time of his removal no longer anemic. *Id.* at 75–77. Nevertheless, he exhibited height and weight readings which placed him below the 25th percentile. *Id.* at 77–78. According to the State Plan of Operation, these are two of the criteria indicative of inadequate growth and development in Priority Group III children. Plaintiffs' Exhibit No. 3, at 11. Furthermore, the medical director of the Jefferson Children and Youth Program testified that Leon's inability to obtain supplemental food might result in nutritional regression reflected by low weight. N.T. 87 (Sept. 5, 1978). The probability of nutritional regression in a child whose anthropometric measurements illustrate an inadequate pattern of growth would, under other circumstances, constitute irreparable injury justifying immediate reinstatement. The possibility of injunctive relief is, however, mooted in Leon's case because he has passed his fifth birthday and is no longer statutorily eligible. *See* 42 U.S.C. § 1786(g)(2) (Supp. V 1975); Plaintiffs' Exhibit No. 5, at 1 (medical chart gives Leon's birth date as Sept. 29, 1973).

While the other children remain definitionally eligible, the evidence presented in their behalf is much less compelling. Tamika Mitchell, the child of plaintiff Sheila Mitchell, began receiving WIC benefits in August 1975. Defendants' Exhibit No. 27,

at 3. Tamika was recertified for WIC on January 19, 1978, at which time the competent professional authority noted that the result of a hematocrit taken on August 25, 1977, was 30%.[20] *Id.* at 1. Her height and weight at that time were, however, well above the 75th percentile. *Compare id.* (height of 41 inches; weight of 39.5 pounds) *with* Plaintiffs' Exhibit No. 4, at 3 (height and weight graph for female child). A hematocrit taken on March 16, 1978, indicated that the earlier anemic condition had been corrected. N.T. 36–37 (Sept. 5, 1978). Furthermore, her height and weight had remained stable, and her diet was adequate. Plaintiffs' Exhibit No. 4, at 4. Notwithstanding an adequate dietary pattern and an absence of both clinical and medical indicators of nutritional need, Tamika continued to receive benefits until June 13, 1978. N.T. 36–38 (Sept. 5, 1978). On that last visit, plaintiff Mitchell received two vouchers and Tamika was removed from the program. Defendants' Exhibit No. 27, at 3. I cannot conclude on the basis of this record that Tamika will incur irreparable injury if further deprived of WIC benefits.

The plight of Sharifa Alexander, the child of plaintiff Luvinia Alexander, presents a somewhat closer question. Sharifa, who was enrolled in the WIC program in February 1977, received her final food prescriptions in March 1978, when she became four years old and was removed from the program. N.T. 64 (Sept. 5, 1978); Defendants' Exhibit No. 28, at 21 (WIC program control card). At that time, her weight was below the 25th percentile, but her other anthropometric and hematological readings were within the normal range. N.T. 65 (Sept. 5, 1978). Dr. Pitt testified that a low weight reading would not, of itself, mandate designation in Priority Group III under the State Plan of Operation, inasmuch as the statute and the regulations commit that decision to the competent professional authority evaluating the recipient. *See* 42 U.S.C. § 1786(e) (Supp. V 1975); 7 C.F.R. § 246.7(b)(2)(ii) (1978).

---

**20.** A hematocrit between 30 and 33 is designated as "less than acceptable low" for children between the ages 2 and 5. N.T. 91 (Sept. 5, 1978) (reading from Pediatric Clinics of North America 265, table 4). A hematocrit less than 30 is considered to be "less than acceptable deficient" whereas a hematocrit level of 34 or above is "acceptable." *Id.*

*Compare* N.T. 63–67 (Sept. 5, 1978) *with* Plaintiffs' Exhibit No. 3, at 11 (criteria for Priority Group III status). Plaintiffs have neither demonstrated that Sharifa's weight would or should constitute a Priority III status of nutritional need nor produced evidence that the absence of WIC supplemental foods will exacerbate Sharifa's low weight or place her in danger of nutritional regression.

No other specific testimony was adduced pertaining to the particular needs of the other children. Furthermore, as I have indicated previously, the dietitian's affidavit will not carry the day for plaintiffs on this issue of irreparable injury. Dr. Pitt's testimony that a child's growth rate slows down after the fourth birthday and that the potential for iron deficiency anemia thereby decreases directly counters the assertion of Ms. Kornblueh. *Compare* N.T. 122–29 (Aug. 8, 1978) *with* Affidavit of Margaret Kornblueh, *supra.* Moreover, Dr. Pitt's testimony is buttressed by the finding of the National Advisory Council on Maternal, Infant, and Fetal Nutrition, which suggests that older children are less critical from the standpoint of nutritional risk. *See* Defendants' Exhibit No. 7, at 6 (children eligible for WIC should receive decreasing priority for each year of life). Notwithstanding the legislative judgment that these children face a special nutritional risk, I cannot find that they are likely to suffer severe, irreparable injury if I do not grant preliminary injunctive relief.

*Additional Countervailing Consideration*

 Even if I were to accept the likelihood of irreparable injury, I cannot ignore the adverse impact of a preliminary injunction upon the defendants and other interested persons. Defendants have maintained throughout this proceeding that these four-year-old children were removed from the WIC rolls because the program had reached maximum participation in November 1977. The City contends that it was confronted with two equally unpalatable alternatives—either continue operation at current caseload and face the probability of a premature shutdown or implement the priority system which entailed the removal of recipients in lesser need. The City further argues that its contractual obligation to remain within its budgetary limits dictated its initial action and requires the continued implementation of the priorities. It had predicted that reinstatement of the Priority V four-year-olds would result in serious cost overruns, causing a breach of its contract with the Department. The City would then have been liable not only for unauthorized food cost expenditures but also for the additional administrative costs.[21]

The plaintiffs, on the other hand, contend that inasmuch as the Department is the agency charged with overseeing the WIC operation in the state, the City's unilateral decision to implement the priorities was unauthorized. They offer figures from the state computers, used by the Department to monitor the City operation, which ostensibly demonstrate significant underspending by the City program. They argue that this evidence proves two crucial points: that the removal of the four-year-olds was unwar-

---

**21.** The posture of this case and the structure of the arguments implicates the legitimacy of the City's budgetary concerns. Generally, where the federal statute outlines eligibility standards, a state's plea of fiscal integrity will not excuse the denial of benefits to those definitionally eligible. *See Townsend v. Swank,* 404 U.S. 282, 291, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Lopez v. Vowell,* 471 F.2d 690, 693 (5th Cir.), *cert. denied,* 411 U.S. 939, 93 S.Ct. 1903, 36 L.Ed.2d 401 (1973); *Alabama Nursing Home Ass'n v. Califano,* 433 F.Supp. 1325, 1330 (M.D. Ala.1977); *Williams v. Wohlgemuth,* 400 F.Supp. 1309, 1321 (E.D.Pa.1975), *aff'd,* 540 F.2d 163 (3d Cir. 1976); *cf. Brown v. Lynn,* 385 F.Supp. 986, 995–97 (N.D.Ill.1974). In the WIC context, however, budgetary limitations may properly be considered. Program funding derives from the federal government and is accomplished on a flat grant rather than open-ended basis. The regulations recognize the limitations implicit in the manner of funding and anticipate the problems inherent in the administration of a program with more needy people than funds to service them. The regulations not only contemplate the possibility of maximum spending but also specifically authorize selective participation according to the priorities outlined in section 246.7 to meet this contingency.

ranted and that their reinstatement would not result in cost overruns.

To support the assertion that the City is powerless to implement the priorities on its own initiative, the plaintiffs rely upon the hierarchy of administrative authority outlined in section 246.3 of the regulations. They focus upon the local agency's obligation to "comply with State agency and FNS guidelines and instructions." Adverting to correspondence between Dr. Pitt and Mary Ann Britton, the state WIC coordinator, plaintiffs argue that the defendants ignored an instruction from the Department to cease implementation of the priorities system. In a letter dated March 15, 1978, Ms. Britton relayed to Dr. Pitt the Department's position that use of the priorities in the City program was premature. Ms. Britton stated that the Department would monitor food expenditures and notify the City when use of the priorities was warranted. Defendants' Exhibit No. 23. A follow-up letter dated April 10, 1978, reiterated that stance. Plaintiffs' Exhibit No. 1.

The City argues that notwithstanding this general regulatory mandate, the contract between the City and the Department takes precedence insofar as it allocates the rights and responsibilities of the two agencies. Referring to the contractual ceiling on food expenditures, the City contends that permitting the state to call the shots relative to priority implementation would place the City in the anomalous position of being unable either to "adhere to its contract or [to] prevent its breach." Defendants' Rebuttal Memorandum of Law at 2.

■ Defendants make a particularly cogent point. Neither the regulations nor the contract specifically repose exclusive authority to decide when to implement the priorities in either the state or the city agency. The regulations simply provide for resort to the priorities when the local agency reaches its maximum participation level. See 7 C.F.R. § 246.7(b)(2)(ii) (1978); 42 Fed. Reg. 43205, 43208 (1977). The November 1977 head count revealed that the City could not accommodate all of its currently enrolled participants and remain within its

budget. The City projected monthly overspending that would exhaust the allotted funds before the end of the contract year, thus necessitating a complete shutdown, if the program continued at the November capacity. The City recognized that an early shutdown would disrupt the continued delivery of the supplemental foods to *all* program participants, impacting most severely upon those most critically in need. N.T. 135–37 (Aug. 8, 1978). The regulations contemplated this predicament and designed the priorities system specifically to prevent its occurrence. *See* 42 Fed.Reg. 43205, 43208 (1977). Since the regulations do not in terms preclude the City from taking the initiative to ensure the equitable allocation of their limited resources, I cannot say that the defendants were foreclosed from implementing the priorities to bring program spending within budget. Indeed, defendants' action is consistent with, if not implicit in, its obligation to keep expenditures within contractual limitations.

Suggesting that the figures from the state computer evidence consistent underspending, plaintiffs have attempted to persuade me that the City's initial decision to institute priorities for participants was precipitate and ill-advised. I cannot agree. Defendants testified that there were approximately 19,000 WIC recipients in November 1977. N.T. 116–18 (Aug. 8, 1978). In a letter dated December 14, 1978, Dr. Pitt conveyed to Ms. Britton the City's estimate that local WIC expenditures at that caseload would result in contract overruns of approximately $10,000 a month. Defendants' Exhibit No. 6. Based upon its experience that program participation tends to mushroom rather than wane, the City believed that resort to the priorities was the only fiscally responsible alternative. N.T. 117–20 (Aug. 8, 1978). That subsequent experience may have failed to substantiate the City's fears is irrelevant. The City's determination to impose the priorities must be judged not from hindsight but from conditions existing at the time the City acted. I cannot say that the City's decision was unreasonable or that it acted without re-

gard for its contractual commitment and the policy underlying the WIC program.

An affirmative response to the question of the City's initial power to impose the priorities does not likewise answer the question whether the City was obliged to capitulate to the Department's judgment that spending levels did not warrant continued implementation of the priorities. Relying upon the state computer figures, the Department insisted that the City had not reached maximum spending levels. *See* Plaintiffs' Exhibit No. 1; Defendants' Exhibit No. 23. The accuracy of the Department's forecast is, however, suspect. Both Dr. Pitt and Ms. Britton testified that the data processing system showed wide fluctuation in both monthly caseload and monthly expenditure figures. N.T. 24, 116 (Aug. 8, 1978); N.T. 10–12 (Sept. 5, 1978). A two or three month time lag in the availability of the figures was routine. N.T. 23, 116 (Aug. 8, 1978). Furthermore, the Department only monitors voucher redemption. *Id.* at 18–19. Because redemption may occur as long as 90 days after issuance, a system that focuses solely on redemption, while ignoring the value of vouchers issued but outstanding, cannot accurately reflect whether a program is operating at maximum capacity or is approaching maximum expenditure as of a given date until at least three months after the fact. Coupled with the built-in lag, the delay in the availability of the figures translates into a possible delay of five or six months before the potential for overspending might become apparent.

Plaintiffs point to the assurance that the City would not be responsible for food cost overruns as undermining the City's justification for the continued use of the priorities. *See* Plaintiffs' Exhibit No. 1. Yet, as Ms. Britton testified, she has no authority to abrogate the contract between the City and the Department, and the Department was unwilling to consent to a contractual modification that would have relieved the City of liability for costs in excess of the contractual ceiling. Contrary to plaintiffs' argument, the Department cannot force the City to operate at a level that the Depart-

ment predicts is within contractual limitations while denying the City protection if that prediction proves wrong. In my view, the admitted unreliability of the state's data processing system and the Department's reliance upon figures based solely upon voucher redemption justified the City's preference for its own assessment and its continuing use of the priorities.

■ One final point demands attention. The plaintiffs insist that notwithstanding the power of the City to institute the priorities, the means used by the City to bring its spending within budgetary limits—that is, the removal of four-year-olds with no medical problem—conflicts with the scheme of priorities outlined on the regulations. I find this contention without merit. The statute includes within its definition of eligibility children under the age of five who meet the nutritional need criteria. 42 U.S.C. § 1786(g)(2) (Supp. V 1975). The regulations in setting forth the priorities distinguish between the degrees of nutritional risk, placing those children with medical and clinical indicators of nutritional need in Priority Group III and those with nutritional need based upon an inadequate dietary pattern in Priority Group V. *Compare* 7 C.F.R. § 246.7(b)(2)(ii)(C) (1978) *with id.* § 246.7(b)(2)(ii)(E).

The City's manner of allocating its allotted moneys neither contravened the regulations nor frustrated their underlying policy. The elimination of Priority Group VI—postpartum women—failed to bring the City's enrollment to an acceptable level, and the City then looked to Priority Group V. The City might have chosen to remove all children in Priority Group V, but the defendants realized that such a drastic step was unnecessary. The City then faced the problem of choosing between those eligible recipients within a single priority category. Because four-year-olds are less likely to develop iron deficiency anemia than children between the ages one and three, Dr. Pitt concluded that four-year-olds were less in need of the supplemental foods. N.T. 122–29 (Aug. 8, 1978). The decision to remove

the four-year-old children with no medical or clinical indicators of nutritional need was based on sound medical judgment that their nutritional need was not as great as the remaining participants. The City's action was consistent with the rationale underlying the priorities in that it "assure[d] that those persons in greatest nutritional need are placed in the Program first." 7 C.F.R. § 246.7(b)(2)(ii) (1978).

I am convinced that defendants' action was both permissible and justifiable. They followed a reasoned course to ensure that delivery of supplemental foods to those most in need would not be disrupted. Because of that finding, the possibility that plaintiffs may succeed on their statutory or constitutional claims with respect to the notice and hearing requirements does not tip the balance in favor of preliminary relief. There has been no showing that any of these children, with the exception of Leon Truitt, was a Priority Group III child who was wrongfully removed from the WIC program. Because I have found that defendants' action in implementing the priorities was consistent with the regulations, these plaintiffs appear to have suffered no actual injury as a result of their removal. Their potential successful prosecution of the claim of the right to written notice and a hearing is unlikely to result in reinstatement of their WIC benefits. Rather, inasmuch as they are members of a group with low priority relative to other competitors for limited governmental resources, they were properly removed, and the defendants' failure to give written notice and to provide for a hearing would entitle plaintiffs to nominal damages only. *Cf. Carey v. Piphus, supra,* 435 U.S. at 259–67, 98 S.Ct. at 1050–1054.

Plaintiffs' failure to demonstrate that they will suffer irreparable injury, coupled with my finding that defendants' action in initiating the priorities was both warranted and permitted under the regulatory scheme, requires me to deny the plaintiffs' motion for a preliminary injunction. The foregoing opinion incorporates the findings of fact and conclusions of law required by Rule 52(a).