**Louise MEEKER, et al.**

v.

**Ronald MANNING, et al.**

Civ. No. H–82–471.

United States District Court,
D. Connecticut.

June 10, 1982.

Edward M. Dale, Shirley Bergert, Connecticut Legal Services, Rockville, Conn., for plaintiffs.

Edmund C. Walsh, Paige Everin, Asst. Attys. Gen., Peter W. Gillies, Deputy Atty. Gen., Hartford, Conn., for defendants.

## RULING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

BLUMENFELD, Senior District Judge.

In this action the named plaintiffs and the class which they seek to represent challenge the manner in which the defendants, officials of the State of Connecticut, have administered and sought to terminate Connecticut's Winter Energy Assistance Program for the 1981–1982 year. The plaintiffs allege that the defendants' administration of the program violated their rights under the Low-Income Home Energy Assistance Act of 1981, Title 26 of the Omnibus Budget Reconciliation Act of 1981, Pub. L.No.97–35, §§ 2601 et seq., 95 Stat. 893 (1981), Connecticut Department of Human Resources regulations §§ 16a–41–16 et seq., and the due process, equal protection and supremacy clauses of the United States Constitution. Named as defendants are Ronald Manning, in his official capacity as Commissioner of the Connecticut Department of Human Resources, Edward Maher, in his official capacity as Commissioner of the Connecticut Department of Income Maintenance, and William O'Neill, in his official capacity as Governor of the State of Connecticut. The plaintiffs assert that jurisdiction is conferred upon the court by 28 U.S.C. §§ 2201, 2202 and 1343(3), and that this court has pendent jurisdiction over any state law claims.

The named plaintiffs are five individuals who applied for benefits under the Winter Energy Assistance Program (WEAP). WEAP is a federally funded block grant program authorized by the federal Low-Income Home Energy Assistance Act of 1981 (the Act). The federal Act requires that a state submit a plan to the United States Department of Health and Human Services agreeing to comply with procedures required by the Act. Id. § 2605(c)(1).[1] Connecticut submitted such a plan which divided the administration of the program among three state agencies. The Office of Policy and Management (OPM) is responsible for coordination of the program. The Department of Income Maintenance (DIM) administers the provision of WEAP assistance to households currently receiving cash assistance under other financial assistance programs. The Department of Human Resources (DHR) administers the program as to those households not receiving cash assistance but having incomes not over 150% of federal poverty levels. DHR administers its part of the program through 14 Community Action Agencies (CAA) covering the entire state.

The program got under way in December 1981. Households receiving assistance through DIM were sent individual notices in December informing them of the program and how to apply for assistance. Brochures describing the program in greater detail were sent in January 1982. DHR, unlike DIM, did not have a list of specific households eligible for assistance and so it relied upon the public media and outreach through community agencies to inform eligible households of the program and application procedures. Under the direct vendor voucher component of the program at issue in this litigation,[2] an applicant must first

1. Those federally mandated procedures relevant to this action include requirements that (1) payments be made only to households meeting certain eligibility qualifications, § 2605(b)(2); (2) in a manner consistent with the efficient and timely payment of benefits, the highest level of assistance be furnished to households with the lowest incomes and highest energy cost, § 2605(b)(5); and (3) an opportunity for a fair hearing be provided to individ-

uals whose claims for assistance are denied or not acted upon with reasonable promptness, § 2605(b)(13).

2. Those households paying for all or some of their utilities or heat in their monthly rent are eligible for direct cash payments. Other households are issued vouchers enabling them to have their oil and/or utility bills paid directly by the agency administering the program. This

apply for a determination of eligibility. After being determined eligible,[3] the household can bring in utility bills for payment by the agency and/or can arrange for the State to pay oil suppliers directly so that fuel deliveries can be made. Only current bills were accepted initially and households were told to bring in their bills every two months.

During the course of the winter many problems developed in the administration of the program. Some households applying for assistance through the CAA's never received a determination of eligibility and thus were not able to receive any benefits under the program. Those who did receive eligibility determinations were told that they were eligible to receive benefits up to a specified maximum amount. In late March and early April it became apparent that the funds available for the program were not going to be sufficient to cover the extensive demands for assistance.[4] In mid-April the decision was made to terminate the program as of April 30, 1982. A notice in English and Spanish was prepared and distributed extensively through the media. No individual notice was sent to recipients

at that time. Bills were accepted[5] through the end of April, although the State concedes that it does not have sufficient funds to pay all of them. At the present time the State intends to use all of the federal block grant funds remaining to pay as many of the bills on hand as is possible[6] and is seeking to allocate those remaining funds in as equitable a manner as possible.

The plaintiffs, five individuals who have applied for and/or received benefits under the program, have filed suit on behalf of a class of similarly situated persons. They claim that the federal Act, the state plan submitted to the United States Department of Health and Human Services, and regulations promulgated by the state agencies administering the program create entitlements which, under the due process clause of the fourteenth amendment to the United States Constitution, cannot be terminated without individual notice and an opportunity for a fair hearing. They also assert claims under the equal protection and supremacy clauses of the United States Constitution and directly under the federal Act.[7]

litigation involves only the voucher component of the program.

3. Making determinations of eligibility is much more complicated for DHR's part of the program than for that administered by DIM. Households served by DIM are automatically eligible if they are receiving benefits under other financial assistance programs administered by DIM. The CAA's, through which DHR administers its program, have to make individual eligibility determinations based upon each household's income. The problems which developed in the application process primarily involved DHR rather than DIM.

4. The defendants have offered the following explanation for their miscalculation concerning the extent of funding that would be necessary to satisfy all requests for assistance under this year's WEAP program. Beginning in March a flood of unexpected applications for assistance deluged both DIM and DHR. The defendants had planned on a regularly consistent flow of applications through the entire winter, but towards the end of the season the number of applications increased substantially. The defendants attribute this increase in requests for assistance to a number of factors: the lowering of the eligibility standard to make households

eligible if their incomes did not exceed 150% of federal poverty levels rather than the approximately 130% standard which was used last year; the generally worsening economy; the unexpectedly long winter which apparently increased the demand for fuel; and the tendency of many persons in need to put off until the last minute making any request for assistance which resulted in a "ballooning" of requests at the end of the winter.

5. In one instance bills were not accepted for a few days during the month of April.

6. The funds originally earmarked for the weatherization component of the program the defendants now expect to be spent paying existing bills.

7. The plaintiffs have not briefed or argued their equal protection and supremacy clause claims. Since I see no merit in either claim it is unnecessary to deal with these issues at length. The supremacy clause claim fails because there is no inconsistency between the state regulations and the federal Act and because the basic concept of block grant programs negates any possible conclusion that Congress intended to preempt the entire field. See, e.g., Florida Avocado Growers v. Paul, 373 U.S. 132, 141, 83 S.Ct.

The plaintiffs seek to represent a single class defined as

all individuals representing households in the state of Connecticut who applied for energy assistance under the Winter Energy Assistance Program ... on or before April 30, 1982 or who were found eligible for WEAP benefits or had those benefits terminated without notice and without notice of or an opportunity for an administrative hearing to challenge such denial or termination.

Plaintiffs' Motion for Class Certification filed June 1, 1982. In fact, the factual situations presented by the five named plaintiffs are not similar and present various distinct legal and factual issues. Plaintiffs Meeker and N'gelo applied for benefits through the CAA's and were sent determination notices by DHR informing them that they were eligible for WEAP assistance up to specified maximum amounts. Both submitted bills to DHR for payment prior to April 30, 1982 which have not yet been paid by the agency. Plaintiffs Ford and Lattanzio applied for benefits through the CAA's in February and March of 1982 respectively. No action has to date been taken on either application, and no notice has been received by them as to their eligibility. They were informed orally in early May 1982 that there would be no WEAP funds to pay their utility bills. Plaintiff Cartier applied for benefits through DIM and was determined eligible but was told orally that no bills submitted after April 30, 1982 would be paid by DIM. All plaintiffs are allegedly subject to utility termination at the present time due to currently unpaid bills.

Presently before the court is the plaintiffs' motion for a preliminary injunction. They seek an injunction (1) requiring the defendants to accept and pay all fuel and utility bills until proper individual notice is given of the proposed discontinuance including notice of an opportunity to challenge such discontinuance through an administrative hearing; (2) requiring defendant Manning, the Commissioner of DHR, to pay for all requests for fuel deliveries and payment of bills made prior to May 1, 1982; (3) requiring defendant Manning to process all applications for WEAP assistance within 21 days [8] of the date of application and to pay assistance to all applicants determined eligible for assistance in the future; (4) requiring defendant Manning to notify applicants of their right to appeal the agency's failure to act upon their applications within 21 days; and (5) restraining all defendants from returning any unspent WEAP funds to the United States Treasury or in any way allowing the funds to leave the state.

The standard in this circuit for issuance of a preliminary injunction is well established. The plaintiff must make a showing of:

possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Caulfield v. Board of Education of City of New York*, 583 F.2d 605, 610 (2d Cir. 1978) (emphasis in original).

The plaintiffs have provided convincing testimony that termination of utility service will cause substantial and irreparable injury to WEAP recipients, particularly the young, the aged and the handicapped. They have also presented evidence that thousands of residential customers have had their utili-

---

1210, 1216–1217, 10 L.Ed.2d 248 (1963). The equal protection claim fails because there is no basis for applying any standard more rigorous than rational basis scrutiny, *see, e.g., San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), and the administration of this program clearly meets this test. Eligibility and maximum amounts were determined according to a carefully planned matrix schedule which took into consideration income levels and family size. The fact that the program contained some elements of a first-come first-served system does not necessarily mean that it is irrational or arbitrary. *See Ingram v. O'Bannon*, 534 F.Supp. 385, 390 (E.D.Pa.1982).

**8.** DHR Regulation § 16a–41–19(k) provides that all applications shall be acted upon within 21 days.

ties shut off due to delinquent accounts and that many more terminations of utility service will in all probability occur unless the State continues to make WEAP payments to the utility companies. All of the named plaintiffs have substantial delinquent bills and face imminent termination of utility service.

The plaintiffs argue that they have a high probability of success on the merits because the legal issue is a relatively simple one. They contend that *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), controls this case and mandates that the requirements of procedural due process be complied with prior to termination of benefits. The defendants argue that (1) the eleventh amendment to the United States Constitution bars the relief sought by the plaintiffs; (2) that this type of mandatory injunctive relief is not appropriate at a preliminary stage of the case because it will not return the parties to the *status quo ante* and because it will inevitably result in an inequitable distribution of those WEAP funds remaining;[9] and (3) that the plaintiffs do not have a probable likelihood of success on the merits because the energy assistance program does not create any entitlement which requires that recipients be given individualized notice that the program is being discontinued.

I. *The Likelihood of Success on the Merits*

The plaintiffs contend that once a recipient is determined eligible the defendants are required to give individual notice prior to any reduction in or termination of benefits and that such notice must give an explanation of the action and inform the recipient of his opportunity to request a fair administrative hearing. In addition, they claim that all applicants must be given notice of their right to appeal the State's failure to act upon their applications within 21 days. Finally, the plaintiffs claim that

the State is obligated to provide the highest level of assistance to those with the lowest income. They base these claims upon various provisions of the federal statute and the state agency regulations which they argue create entitlements which the State may not terminate without compliance with the requirements of due process.

The legal basis for this constitutional claim is the seminal decision of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) which held that a person receiving welfare benefits under statutory standards defining eligibility has a property interest in the continued receipt of those benefits which is protected by the requirements of procedural due process. In order for procedural due process rights to attach, however, state or federal law must create a " 'legitimate claim of entitlement' within the protection of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11–12, 98 S.Ct. 1554, 1561–1562, 56 L.Ed.2d 30 (1978). Although the interest which is entitled to due process protection is created, in many cases, by state law, the issue of when such an interest rises to the level of a constitutionally protected "property interest" or entitlement is a question of federal, not state, law. *Logan v. Zimmerman Brush Co.*, —— U.S. ——, ——, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982), (quoting *Vitek v. Jones*, 445 U.S. 480, 491, 100 S.Ct. 1254, 1262–1263, 63 L.Ed.2d 552 (1980)).

The standard for determining when such a legitimate claim of entitlement is created has been expressed by the Supreme Court as follows:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .

9. The defendants have moved for a protective order prohibiting the defendants from making any further payments from remaining energy assistance funds until further order of the court. The defendants thus hope to protect the remaining funds so that an eventual distribu-

tion can be made which will be as equitable as possible. In view of the court's disposition of the plaintiffs' motion for a preliminary injunction, it is not necessary for any action to be taken on this motion for a protective order.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly, supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Although government benefits, such as welfare or the energy assistance payments at issue in the case at bar, may constitute a property interest, not every government benefit program creates a property interest. A close examination of the statute or regulations which allegedly create such entitlements is required in order to determine both the existence and scope of the claimed entitlements. *See Ingram v. O'Bannon,* 534 F.Supp. 385, 388 (E.D.Pa.1982) (no entitlement to homemaker services created by federal statute or by Pennsylvania regulations implementing Title XX of the Social Security Act, as amended by the Omnibus Budget Reconciliation Act of 1981, Pub.L.No.97–35, § 2351, 95 Stat. 867, the same Block Grant Act creating the WEAP program at issue here.) It is necessary, therefore, to look at the specific statutory provisions and regulations which the plaintiffs claim create these entitlements.

The plaintiffs claim an entitlement to continued receipt of benefits up to the maximum amount specified in their determination of eligibility notices. They base this claim of entitlement on the eligibility standards found in the federal statute as well as the following regulations of DHR:

The applicant/service recipient shall be provided with written notice of approval, denial or discontinuance of eligibility . . . .

DHR Regulations § 16a–41–19(1);

An evidentiary hearing is allowed when . . . a service recipient household has evidence that payment(s) were made in a different amount(s) from that which said service recipient household was previously notified it was to receive.

DHR Regulations § 16a–41–21(a)(1); and

Service provider agencies shall advise service recipients as to the best way to maximize the benefits available to those service recipients by providing information on the amount of the maximum availability of assistance and how to obtain it.

DHR Regulations § 16–41–19(d). They also rely on the determination of eligibility notices sent to plaintiffs Meeker and N'gelo and the class they seek to represent which informed applicants that "[y]our household has been determined income and program eligible to receive [a specified maximum amount] in benefits under the following fuel assistance program." Defendant DHR's Exhibit EE. Various programs including the federal fuel assistance program are then specified and the applicable program or programs marked. Toward the bottom of the form the notice stated:

If your household has been determined eligible for any of our energy programs, it will remain on our caseload through [a specified date, in the plaintiffs' cases September 30, 1982]. . . . You will be receiving a redetermination notice approximately one month prior to your ending date.

*Id.*

Unlike the statute at issue in *Goldberg v. Kelly,* the federal statute here does not prescribe specific standards of eligibility. Instead Congress left that question to the states and only set the outside limits of eligibility. In other words, Congress provided that the states "make payments under this title only with respect to—[households receiving benefits under certain federal aid programs] or (B) households with

incomes which do not exceed" either 150% of federal poverty levels or 60% of state median income whichever is greater. Pub. L.No.97–35, § 2605(b)(2). Within that class the states are free to define standards of eligibility. The regulations promulgated by DHR do define income eligibility and program eligibility. DHR Regulations § 16a–41–17(a) and (b). However, they also provide that "this is not an entitlement program," DHR Regulations § 16a–41–18(a), that fuel assistance payments will not exceed certain specified maximum amounts, § 16a–41–18(b), and that "[p]ayments shall be subject to the availability of funds," § 16a–41–18(c).

■ Viewed in their entirety, I must conclude that these regulations do not create an entitlement to receive the maximum amount of benefits specified in the determination notices.[10] The explicit disclaimer stating that no entitlement has been created and the statement that payment shall be subject to the availability of funds negate any inference that this is an ongoing entitlement program. The determination notices stated that households would remain on DHR's caseload for a specified period but did not state that benefits would be received until that date. DHR administers a variety of energy assistance programs and the notices have been designed to cover all of them. Households receiving a determination of eligibility are informed that they will remain on the agency's caseload and are considered eligible to receive whatever benefits are available through that date, not that they will definitely receive benefits up to the maximum amount for that time period. The regulation providing that recipients and/or applicants shall receive "written notice of approval, denial or discontinuance of eligibility," § 16a–41–19(1), applies only to discontinuance of eligibility, not discontinuance of benefits. The provision for an evidentiary hearing when a household "has evidence that payment(s) were made in a different amount(s) from that which said ... household was previously notified it was to receive," § 16a–41–21(a)(1), refers to the agency's issuance of vouchers for payment of specific bills not the determination notice's specification of maximum benefits potentially available to the household. Finally, the regulation providing that recipients shall receive advice as to how to obtain the maximum amount of assistance creates only an obligation to advise recipients not an entitlement to a specific amount of benefits.

The plaintiffs have not pointed out to the court any specific regulation creating an entitlement to continued benefits up to the maximum amount. They would, however, have this court draw the inference that whenever a state sets up a public assistance program it necessarily creates an entitlement program requiring individual notice and an opportunity for a fair hearing prior to termination of the program. This is not what *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), nor any of its progeny held, however. In *Goldberg v. Kelly* the Court held that where welfare benefits are a matter of statutory entitlement a pre-termination hearing is required to enable recipients to "challenge[ ] proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Id.* at 268, 90 S.Ct. at 1020. This doctrine is only relevant where the recipient is challenging the application of a general rule to his particular individual situation. It serves no purpose to require individual hearings where the challenge is to a rulemaker's general classification or to the policy decision to terminate a program. Where there is no discretionary decision to be made and no possible erroneous factual findings or premises to be challenged, an individual hearing would be merely an empty formality. *See Koch v. Yunich*, 533 F.2d 80, 85 (2d Cir. 1976).

The plaintiffs' reliance on § 2605(b)(5) of the federal statute to create an entitlement

---

**10.** See also the brochure sent to eligible households by DIM which clearly informed recipients that the assistance would be available only for a limited time and that, therefore, "it is important for you to apply for help as soon as possible." DIM's Exhibit D.

to continued receipt of benefits is also misplaced. This statutory provision required the State to design the program

> in a manner consistent with the efficient and timely payment of benefits, [so] that the highest level of assistance will be furnished to those households which have the lowest incomes and the highest energy costs in relation to income, taking into account family size.

§ 2605(b)(5). The State complied with this provision by designing a "matrix" schedule coordinating the income level and family size of households to the maximum amount of assistance available. Defendant DIM's Exhibit A.

The final claim raised by the plaintiffs' complaint is that all applicants are entitled to a decision on their applications within 21 days and to a fair hearing to contest a determination of ineligibility or the State's failure to act upon an application within that period. Two of the named plaintiffs fall within the class of persons who applied for WEAP assistance but never received a determination notice concerning their eligibility. As a result they were never able to submit bills to the state agencies for payment.

■ The federal statute provides that the State shall agree to

> provide an opportunity for a fair administrative hearing to individuals whose claims for assistance under the plan . . . are denied or not acted upon with reasonable promptness.

§ 2605(b)(13). In addition DHR regulations provide that a decision shall be made on all applications within 21 days and that applicants shall receive written notice of that decision within 7 days. DHR Regulations §§ 16a–41–19(k) and (1). The regulations also provide for a hearing where an applicant "is aggrieved because the service provider agency failed to act upon its application within twenty-one days . . . ." DHR Regulation § 16a–41–21(b)(1)(A). These provisions specifically require that certain procedural requirements be complied with.

Applicants are entitled to assume that they will receive a decision on their applications within the period specified by the State's regulations. I, therefore, conclude that the WEAP program, as designed by the federal statute and the state regulations, does create a right to a timely determination of eligibility and the opportunity for a fair hearing to contest a determination of ineligibility.

■ For the reasons stated above I conclude that plaintiffs Ford and Lattanzio, who applied for benefits through DHR but never received determination notices and were never informed of their right to appeal the State's failure to act upon their applications, have shown a likelihood of success on the merits of their claim insofar as it challenges the defendants' failure to act upon their applications and provide them with an opportunity to challenge this failure to act.

As far as the other plaintiffs and the other claims presented by the complaint are concerned, I conclude that there is not a probable likelihood of success on the merits of these claims and that, therefore, the plaintiffs are not entitled to a preliminary injunction requiring the payment of benefits to those plaintiffs who have received eligibility determinations. The State was not required to provide individual notice and an opportunity for a fair hearing in order to terminate its energy assistance program. As the Supreme Court has recently reiterated, the due process clause leaves a state free to "amend or terminate its welfare . . . programs." *Logan v. Zimmerman Brush Co.,* —— U.S. at ——, 102 S.Ct. at 1155.

The plaintiffs' request for a preliminary injunction is denied, therefore, to the extent that they seek an order requiring the defendants to continue to pay assistance until individual notice and an opportunity for a hearing is given to all recipients and to pay for all fuel bills and requests for delivery made prior to May 1, 1982.[11]

---

11. As to the request for an injunction requiring the payment of bills submitted prior to May 1,

1982, the plaintiffs could not obtain this relief from this court even if they had been able to

As to the request that the defendants be restrained from returning any unspent WEAP funds to the United States government, the defendants have clearly stated their intention to distribute all of the WEAP funds remaining among eligible recipients in as equitable a manner as possible. *E.g.*, Defendants' Memorandum in Support of Defendants' Motion for a Protective Order. It is inconceivable to the court that the defendants would return any WEAP funds to the federal government to the prejudice of the plaintiffs and the class which they seek to represent. It does not appear necessary, therefore, to issue an injunction restraining the defendants from doing something which they have no intention of doing, and which they have represented to the court they will not do.

## II. *The Propriety of the Requested Injunctive Relief*

It remains to be determined whether and to what extent the plaintiffs Ford and Lattanzio are entitled to the injunctive relief they seek as to their claim that they are entitled to a timely determination of eligibility and notice of their right to contest a denial of eligibility or a failure by the defendants to act on their applications. The plaintiffs have made a sufficient showing of irreparable harm because, if they do not receive a determination of eligibility, they will have no way of participating in the eventual allocation of those WEAP funds which will be distributed by the defendants

in as equitable a fashion as possible. They are, therefore, entitled to an order requiring the defendants to make a determination of eligibility on all applications submitted prior to April 30, 1982,[12] and to notify all those who have submitted applications but have not received such a determination of their right to appeal the defendants' failure to act upon their applications.

The plaintiffs also, however, request an order requiring the defendants to pay assistance to those determined to be eligible. This raises the problem of the eleventh amendment and the extent to which it applies to bar this aspect of the relief sought by the plaintiffs.

The eleventh amendment to the United States Constitution has been consistently held to bar suits against a state in federal court absent the state's consent to suit or congressional abrogation of the state's eleventh amendment immunity.[13] *E.g.*, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976); *Edelman v. Jordan*, 415 U.S. 651, 662–63, 672–74, 94 S.Ct. 1347, 1355–1356, 1360–1361, 39 L.Ed.2d 662 (1974). Under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), state officials can be prospectively enjoined from violating federal law despite the eleventh amendment. The Supreme Court, however, has drawn a distinction between prospective injunctive relief permissible under the eleventh amendment and retroactive injunctive relief against

show a likelihood of success on the merits of their claim. The eleventh amendment to the United States Constitution bars a federal court from ordering such retrospective monetary injunctive relief. *See* pages 140–142 *infra*.

**12.** The plaintiffs only seek to represent those persons applying for benefits on or before April 30, 1982. Plaintiffs' Motion for Class Certification. This is an appropriate class, and to this extent only plaintiffs' motion for class certification is granted.

**13.** The state has not consented to suit in this case. *See, e.g., Florida Dept. of Health v. Florida Nursing Home Ass'n*, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981) (per curiam). Nor has Congress expressed its intention to abrogate the states' immunity. This statute does not contain "the threshold fact of

congressional authorization to sue a class of defendants which literally includes States." *Edelman v. Jordan*, 415 U.S. at 672, 94 S.Ct. at 1360. The Court has clearly held that 42 U.S.C. § 1983, which is pleaded by the plaintiffs in the case at bar, does not represent a congressional decision to abrogate the eleventh amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 345, 99 S.Ct. 1139, 1147, 59 L.Ed.2d 358 (1979). There is no basis, therefore, for a finding of congressional abrogation nor for a finding of the state's consent to suit either in fact or constructively through its participation in this block grant program, *see Florida Dept. of Health v. Florida Nursing Home Ass'n*, 450 U.S. at 150, 101 S.Ct. at 1034; *Edelman v. Jordan*, 415 U.S. at 673–74, 94 S.Ct. at 1360–1361.

state officials which will result in an order requiring the payment of money which shall come, not out of the pockets of the state officials, but from the state treasury itself. *Edelman v. Jordan*, 415 U.S. at 664–69, 94 S.Ct. at 1356–1358. Whether or not a "retroactive award of monetary relief [is described] as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of damages against the State." *Id.* at 668, 94 S.Ct. at 1358.

██ The plaintiffs attempt to bring this case within the doctrine of *Ex Parte Young.* An ancillary effect on the state treasury is proper under the eleventh amendment as long as it is merely "a necessary consequence of compliance in the future with a substantive federal-question determination." *Edelman v. Jordan*, 415 U.S. at 668, 94 S.Ct. at 1358. The line between prohibited retroactive payments and permissible prospective relief is not always an easy one to draw. *Id.* at 667, 94 S.Ct. at 1357. However, the award of an "accrued monetary liability" has been clearly held to constitute a retroactive payment barred by the eleventh amendment. *Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 2761–2762, 53 L.Ed.2d 745 (1977).

The plaintiffs seek an order from this court requiring the defendants to pay utility bills which are currently due and owing. They are not concerned with bills which the plaintiffs and the class they seek to represent may incur in the future. They want the plaintiffs' existing debts to their energy suppliers paid so that their utility service can be restored and/or maintained. All of the named plaintiffs are currently subject to immediate utility termination due to currently unpaid bills. An order which only required the defendants to pay bills incurred from this date forward would not avoid the immediate threat of utility termination which underlies the plaintiffs' showing of irreparable harm.

██ The plaintiffs contend that the payment of currently existing utility and fuel bills is not an "accrued monetary liability" because the WEAP program has no speci-

fied due date for the payment of benefits by the state agencies. The court cannot accept the reasoning of this attempt to distinguish *Edelman v. Jordan.* In a case closely on point as far as the eleventh amendment issue is concerned, the Fourth Circuit was confronted with a challenge to a state's across-the-board reduction in medicaid benefits. *Kimble v. Solomon*, 599 F.2d 599 (4th Cir.), *cert. denied sub nom. Buck v. Kimble*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979). The plaintiffs there sought reimbursement for health care expenditures incurred since the reduction in the program as well as prospective restoration of benefits for future treatments. The court held that an order requiring the state to pay for medical treatments already received was barred by the eleventh amendment under *Edelman v. Jordan* and *Milliken v. Bradley. Kimble v. Solomon*, 599 F.2d at 604–05. The rationale for this distinction was the court's determination that the state's

> obligation to pay these benefits arose at the time the treatments were received .... To require the state to make payments for these past medical services would be tantamount to "'the award of an *accrued* monetary liability ...' which represent[s] 'retroactive payments.'" *Milliken v. Bradley*, 433 U.S. at 289, 97 S.Ct. at 2761 (quoting *Edelman v. Jordan*, 415 U.S. at 663–64, 94 S.Ct. 1347) (emphasis supplied by the *Milliken* Court).

*Id.* I agree with this analysis and find it controlling in the situation presented by the case at bar. The fact that the state agencies had no specific due date by which they were supposed to pay submitted utility bills does not make those bills any less an accrued liability. The rationale of the distinction made by the *Edelman* Court was that in the case of a decree which is prospective only the state can plan its future course of action taking into account any added cost which might result from the result of the federal court's order. *Edelman v. Jordan*, 415 U.S. at 666 n.11, 94 S.Ct. at 1357 n.11. Where a federal court orders the payment of a definable amount of money to correct

past errors, the state will not have an opportunity to change its course of conduct to minimize the cost should it decide not to assume this added cost. Such would be the situation were this court to order the defendants to pay existing utility bills to those persons whose applications were not acted upon in a timely fashion. I must reluctantly conclude, therefore that any relief requiring the defendants to pay for utility or fuel bills incurred prior to the date of this court's decree is barred by the eleventh amendment.

## III. *Order*

The defendants are hereby restrained from failing and refusing to process applications for WEAP aid within 21 days from the date of application.

The defendants are further restrained from failing to notify applicants for WEAP aid of their right to appeal any failure to act upon their applications within 21 days and of corresponding appeal procedures.

SO ORDERED.