**Linda INGRAM, et al.**

v.

**Helen B. O'BANNON, et al.**

**Civ. A. No. 78–86.**

United States District Court,
E. D. Pennsylvania.

Feb. 25, 1982.

Deborah Harris, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

John G. Knorr, III, Deputy Atty. Gen., Commonwealth of Pa., Dept. of Justice, Harrisburg, Pa., for defendants.

### MEMORANDUM AND ORDER

HUYETT, District Judge.

The plaintiff class consists of all those residing in Philadelphia who are or will be

---

eligible for homemaker service, who have requested or will request this service, and who have not received or will not receive it. Within the class, the plaintiffs fall into two groups, applicants and former recipients.[1] The applicants are those persons who are eligible to receive the service based upon their financial status and need for the service. They have requested the service but have not received it. Their requests are placed on waiting lists until a homemaker is available. If they request the service for a specific time and the time passes without the service being made available to them, then their request is canceled. The complaint of the applicants is two-fold: (1) because they meet the pertinent financial and need standards, they contend that they are entitled to receive the service with reasonable promptness which in some cases means immediately, and (2) if they do not receive the service with reasonable promptness, then procedural due process requires that they receive notice and the right to appeal. The defendants contend based upon the language of the state regulation that the plaintiffs do not have an entitlement to the service and therefore, have not been denied due process.

The second group within the class are persons who until recently received the service but whose service was terminated because of a reduction in federal funding. The former recipients' claim is the same as the applicants' first claim: as long as the state continues to offer the service and the plaintiffs meet the financial and need standards, they are entitled to receive the service. The former recipients do not press a procedural due process claim. The former recipients were notified that their service was being terminated and that they would be referred to another social service agency. They were given notice of their right to appeal the termination. The benefits of those who appealed were continued pending the resolution of all appeals. All of the appeals decisions were in favor of the secretary of the Pennsylvania Department of Public Welfare (DPW). By agreement the benefits were continued until February 11, 1982, the date of a hearing before me on plaintiffs' request for a preliminary injunction.

On Thursday, February 11, 1982, following a hearing in open court I denied the plaintiffs' request for a preliminary injunction. Before me now are the parties' cross-motions for summary judgment.[2] For the same reasons that I concluded that the plaintiffs had failed to show a likelihood of success on the merits at the preliminary injunction hearing, I conclude that the defendants' motion for summary judgment should be granted. This opinion memorializes my reasons for denying the plaintiffs' motion for a preliminary injunction as well as their motion for summary judgment, and for granting defendants' motion.

The first issue to be determined is whether the plaintiffs have an entitlement to homemaker service. Plaintiffs contend that they have a property interest in receiving the service which is protected by the due process clause. Because I conclude that there is no entitlement to the service, I do not reach the applicant-plaintiffs' procedural due process argument. I recognize that all persons have an interest flowing directly from the due process clause to be free from arbitrary and capricious government action. See Block v. Potter, 631 F.2d 233 (3d Cir. 1980). Therefore, I have considered whether the state's actions are arbitrary and capricious. I conclude that they are not.

Any property interest that the plaintiffs might have had would have been created by the legislation and regulations governing homemaker service. Originally, this action

1. Former recipients moved to intervene in this action although they contended that they were already members of the class. I agree that they are included in the class and therefore, intervention is not necessary.

2. The plaintiffs' complaint contained a count alleging that the state had misappropriated and misused Title XX grant funds. This allegation was not relied upon in either the motion for preliminary injunction or the cross-motions for summary judgment. At the oral hearing on plaintiffs' request for a preliminary injunction, the plaintiffs withdrew this allegation.

was governed by 42 U.S.C. § 1397 (amended 1981), Title XX of the Social Security Act, entitled "Grants to States for Services." The Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 2351, 95 Stat. 867 rewrote Title XX of the Social Security Act. The new Title XX is titled "Social Services Block Grant Act" (Block Grant Act). The goals of Title XX remain the same, however, the amendment substantially changes the states' administrative responsibilities. The Block Grant Act no longer requires the states to provide at least one service addressing each of the five goals of Title XX. States are no longer required to adopt state Plans but instead are to submit Reports to the federal government on how the grant is being used. The Block Grant Act relaxes the procedure by which states alter their lists of services offered. Under the Block Grant Act the states are no longer required to provide matching funds. The states are no longer required to spend a specific portion of their grants on welfare recipients. They are no longer limited in their ability to charge fees for social services, and no longer prohibited from providing services to families with incomes that exceed 115% of the states' median income. Title XX was always designed to give the states great flexibility in the delivery of social services. The 1981 amendment was adopted "in order to eliminate burdensome restrictions on programs and to give the States the increased flexibility they need to target resources on problems which they regard as most important." 1981 U.S.Code Cong. & Adm.News 396, at 799 (Senate Report). Because the plaintiffs seek prospective relief only, the Block Grant Act, the current version of Title XX, applies to their claims.

In conjunction with the amendment of Title XX, the secretary of U.S. Department of Health and Human Services (HHS) revised the existing regulations relating to Title XX. *See* 46 Fed.Reg. 48,582 (Oct. 1, 1981) (to be codified at 45 C.F.R. §§ 16, 74, & 96). The new regulations state that they are intended to lift the regulatory burden on the grantee states. *Id.* at 48,593. Before Title XX's amendment, the regulations

governing it appeared at 45 C.F.R. § 1396. The prior regulations were extensive. They established procedures, content requirements for state plans, reimbursement rates, and limitations on individuals served, eligibility and fees. The section on eligibility was central to the parties supplementary memoranda in support of their motions. This regulation no longer exists. Furthermore, the secretary did not replace the removed regulations with comparable ones because:

> [t]he Secretary has determined that the Department should implement the block grant programs in a manner that is fully consistent with the congressional intent to enlarge the States' ability to control use of the funds involved. Accordingly, to the extent possible, we will not burden the States' administration of the programs with definitions of permissible and prohibited activities, procedural rules, paperwork and recordkeeping requirements, or other regulatory provisions.

46 Fed.Reg. at 48,582.

■ The state of Pennsylvania also reacted to the Block Grant Act by enacting new regulations. First, the state repealed all pertinent parts of its Title XX state Plan. In its place, the state published a new Report and regulations implementing the Block Grant Act. *See* 11 Pa. Bulletin 3901 (Oct. 31, 1981). These regulations govern the state's use of Title XX monies to provide approximately twenty-two services, one of which is homemaker service. The plaintiffs agree that neither the federal statute nor the federal regulations give them an entitlement to the service. They rely upon the state regulations to create an entitlement to homemaker service. In other words, the plaintiffs contend that they have a property interest in receiving homemaker service which is protected by the due process clause. Without such a protected interest, even a "grievous loss" will not implicate the due process clause. *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). The Supreme Court has stated: "To have a property interest in a benefit, a person clearly must

have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Court continued:

> [p]roperty interests are not, of course, created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* Receipt of a government benefit can constitute a property interest. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1968) (welfare benefits). However, not every benefit program creates a property interest. Where the plaintiffs allege that the interest is created by statute or regulation, a close examination of the provisions of the statute or regulation is required. *See O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). Those provisions both create the interest and define its scope. Therefore, I turn to the Pennsylvania regulations relating to homemaker service.

Homemaker service is one of twenty-two services that the DPW makes available through the use of its Title XX block grants. Homemaker service "consists of activities provided in the person's own home by a trained, supervised homemaker when there is no family member or other responsible person available and willing to provide such services or to provide occasional relief to the person regularly providing such service." 11 Pa.Bulletin at 3905. Homemakers provide such services as cooking, cleaning, handling simple financial matters and providing non-medical personal care of the recipient.

With respect to homemaker service the regulations provide that one is financially eligible if one is either a current recipient of Aid to Families with Dependent Children (AFDC), or current recipient of Supplemental Security Income (SSI), or current recipients of State-funded General Assistance or a primary recipient whose family monthly gross income does not exceed 50% of the State median income, adjusted according to family size. 11 Pa. Bulletin 3922 (Oct. 31, 1981) (to be codified at 55 Pa.Code § 3-1-22). In addition to financial eligibility, an applicant must need the service for one of the following reasons.

(1) *Emergency Basis Personal Care or Home Help.* To receive personal care or home help to alleviate an unsafe or unsanitary condition on an emergency basis, a situation must exist in which failure to provide the activity would result in the immediate danger of death, neglect, or serious injury, and the person is functionally unable to perform life essential tasks of daily living or care for dependents, and (a) live alone or with other functionally disabled or dependent person(s); or (b) have no family member or other responsible person available and willing to perform life essential tasks for him/her or for dependents;

(2) *Personal Care on an Ongoing Basis.* To receive personal care on an ongoing basis, the person must be functionally unable to perform life essential tasks of daily living or care for dependents, and (a) live alone or with other functionally disabled or dependent person(s); or (b) have no family member or other responsible person available and willing to perform life essential tasks for him/her or for dependents;

(3) *Instructional Service.* To receive instructional service, the person must be functionally able to perform, but lack the knowledge to carry out life essential tasks including basic care in home management, and/or care for dependent members of the household, and/or self care;

(4) *Caretaker Relief.* To receive caretaker relief, the person must be functionally unable to perform life essential tasks of daily living or care for dependents, and be receiving home care and/or personal care on a seven day/week, 24-hour basis,

from a person whose ability to provide adequate care is decreasing because of constant stress and the lack of personal time. Caretaker relief is limited to a maximum of 208 hours per 12 month period, per household;

(5) *Home Help on an On-Going Basis.* To receive home help on an on-going basis, the person must be functionally unable to perform life essential tasks of daily living or care for dependents, and (a) live alone or with other functionally disabled or dependent person(s); or (b) have no family member or other responsible person available and willing to perform life essential tasks for him/her or for dependents.

*Id.* at 3922–23. If these were only regulations governing the provisions of Title XX and homemaker service, the plaintiffs' argument for the existence of an entitlement might have some merit. However, the regulations continue. Section 3–1–27 provides:

3–1–27. When demand for this service exceeds the available resources, service may not be denied. The established need categories must be used, in the order listed, to establish rank for receiving the service at an appropriate later date. However, if an individual's situation indicates that a delay in service may be life threatening, service to that person may take precedence over all categories of need.

I interpret this regulation to mean that the state's inability to provide service to one who meets financial and need standards does not result in a denial of service if arrangements are made to ensure that the applicant will receive service at a later time. DPW carries out this regulation by establishing waiting lists, ranking applicants by the need category in which they fall, and providing the service as soon as a homemaker becomes available. Regulations governing Title XX services generally also approve of the use of waiting lists for persons who meet all of the eligibility requirements. *See* 11 Pa. Bulletin at 3932, 55 Pa.Code §§ 3–1–165 to 3–1–171. With respect to persons receiving Title XX services whose services are terminated, the regula-

tions state that the provider "is responsible for making suitable arrangements or referrals to assure continuity of service." 11 Pa. Bulletin at 3925. 55 Pa.Code § 3–1–58. This last regulation has been interpreted on behalf of the Secretary of DPW to mean that the terminating agency must make a referral but need not guarantee continuity by continuing the service until the second agency begins service. *See* Exhibit P–101 to –110.

■ As stated above, in determining what the legitimate expectation of the parties was, all of the pertinent regulations must be taken into account, not just the financial and need standards. Looking at the regulations as a whole, I conclude that the regulations do not create an entitlement to the service or at most, create an entitlement to receive the service as it is available. The service *as defined* includes the use of waiting lists. The regulations recognize that demand may surpass available service providers. The regulations respond to this problem by creating prioritized waiting lists. This regulations negates any allegation that when demand surpasses availability, applicants have a legitimate expectation that the state will increase funding of the program to ensure that all applicants received the service. Nothing in the state regulations can be construed to create the expectation that the applicant-plaintiffs claim to have. Thus, their expectation is truly unilateral and is not protected by the due process clause.

■ Similarly, the former recipients claimed expectation of continued service is without basis in the regulations. The regulations as interpreted by the Secretary clearly permit the termination of service if a referral is made and the recipient is given an opportunity to appeal and a hearing. The plaintiffs who were former recipients were given an opportunity to appeal, received hearings and were referred to other agencies. They have no legitimate expectation beyond that. Thus, they have not been deprived of a property interest protected by the due process clause.

The plaintiffs have argued, relying upon Supreme Court and Third Circuit precedent, that the defendants must provide the service immediately or shortly after eligibility is determined to all persons who meet the financial and need standards. The plaintiffs' reliance on such cases as *Quern v. Mandley*, 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978), *White v. Beal*, 555 F.2d 1146 (3d Cir. 1977), and *Williams v. Wohlgemuth*, 540 F.2d 163 (3d Cir. 1976) is misplaced. The constitutional underpinning of these cases was the supremacy clause, not the due process clause. In these cases, the federal legislation established eligibility standards which the states were bound to apply as a matter of federal statutory law if the state offered the program. In these cases, the state added a requirement which impermissibly narrowed the eligibility standards created by the federal legislation. In these cases, the state's additional requirement violated federal law and rendered the state ineligible to participate in the federal program.

Title XX as it presently exists is entirely different from the statutory schemes involved in the cases relied upon by the plaintiffs. There is no argument in this case that the Pennsylvania regulations or practices violate some provision of the controlling federal statute or regulations. Thus, the cases dealing with inconsistencies between the federal statute and the state regulations are inapposite.

The plaintiffs also argued that the state's use of waiting lists was arbitrary and capricious and therefore, violated the plaintiffs' due process rights. The plaintiffs argued that the state has created a first-come first-serve system which is irrational. I questioned the plaintiffs' counsel at oral argument concerning alternatives to the present system. One suggested alternative would be for the state to restrict the definition of those financially eligible. However, the regulations now define eligibility for homemaker service by reference to eligibility standards for other services. Thus, the state would either have to abandon any attempt to integrate its social services or have to change the eligibility standards for services other than homemaker service. Furthermore, requiring the state to restrict the financial standard would frustrate Congress' intention to allow the states to decide how the programs would be targeted. As the regulations now stand, an individual in need category 1 will receive the service before someone in need category 5 even though the individual in need category 5 is in worse financial straits than the individual in need category 1. This is the type of targeting decision which Congress intended to leave to the states. If the financial standard were further restricted, it could render ineligible persons in high need categories while allowing persons who the state considers to be less in need to remain in the program. Thus, with respect to this type of service, restriction of the financial standards is not a better way or necessarily the rational way to allocate the resources. The state's present system which emphasizes need over financial status is a rational way to allocate resources. Thus, I conclude that the state's present system is neither arbitrary nor capricious.

For all the reasons stated above, I conclude that the defendants have not violated the due process rights of the plaintiffs. Accordingly, I will grant the defendants' motion for summary judgment and deny the plaintiffs' motion. An appropriate order follows.