Luvinia ALEXANDER, for herself and as guardian ad litem for Sharifa Alexander, Sylvia Bey, for herself and as guardian ad litem for Trustin Bey, Irene Burkett, for herself and as guardian ad litem for Robert Burkett, Andrea Carey, for herself and as guardian ad litem for Leslie Bonita Rex, Sheila Mitchell, for herself and as guardian ad litem for Tamika Mitchell, Elizabeth Truitt, for herself and as guardian ad litem for Leon Truitt

v.

Louis POLK, M.D., Acting Director of the Philadelphia Department of Health, individually and in his official capacity, et al.

Civ. A. No. 78–2594.

United States District Court, E.D. Pennsylvania.

Sept. 29, 1983.

See also D.C., 459 F.Supp. 883.

606

Richard P. Weishaupt, Philadelphia, Pa., for plaintiffs.

Pamela L. Perry, Deputy City Sol., Philadelphia, Pa., for City.

David H. Ward, Office of Legal Counsel, Dept. of Health, Harrisburg, Pa., for Com.

## OPINION

LUONGO, Chief Judge.

In August, 1978, this action was filed against the City of Philadelphia and individual City officials under 42 U.S.C. § 1983, challenging the City's administration of the Supplemental Food Program for Women, Infants, and Children (WIC), 42 U.S.C. § 1786.[1] Plaintiffs sought injunctive relief and damages related to the City's decision to institute the priority program described in the regulations, 7 C.F.R. § 246.7, which resulted in the removal from the WIC program of all four-year-olds in the Priority V group. Plaintiffs also challenged the City's failure to provide removed recipients with either the notice prescribed by the regulations, 7 C.F.R. § 246.24, or process which would meet the requirements of the due process clause.

On August 8 and 10 and September 5, hearings were held on the preliminary injunction issue. The hiatus in the hearings was due to settlement negotiations which ultimately failed to resolve the dispute. My reasons for denying the preliminary injunction were discussed in detail in *Alexander v. Polk*, 459 F.Supp. 883 (E.D.Pa.1978). That opinion details the facts of this case and they will be repeated here only in summary form.

On December 19, 1978, after the denial of the preliminary injunction, plaintiffs amended their complaint to include several Commonwealth of Pennsylvania defendants and the Pennsylvania Department of Health. The Commonwealth, under whose aegis the City administered the WIC program, had been a participant in the failed negotiations between the parties. Plaintiffs' complaint attacked the Commonwealth's failure to provide adequate notice and hearings.

In February, 1979, I certified a class of all four-year-old children who were terminated from the WIC program pursuant to the priority program without written notice and an opportunity to be heard.[2] Plaintiffs and the City defendants then engaged in discovery and the plaintiffs and Commonwealth defendants negotiated and formulated the guidelines for notice and hearing required by the WIC statute. Because these negotiations were successful in producing the desired procedures, plaintiffs seek no further relief from the Commonwealth defendants.[3] The City stopped making terminations under the priority program on November 27, 1978 and shortly thereafter discontinued administering the WIC program altogether. Plaintiffs, therefore, no longer seek injunctive relief against the City defendants. The City defendants and plaintiffs agree that, at this time, only one issue remains to be resolved[4]—the City's liability for damages

1. I am only concerned with the WIC Act as it existed when the alleged illegal terminations occurred. Accordingly, all references will be to the version of the Act appearing in the 1978 edition of 42 U.S.C.A. (West). The supplement to that volume contains amendments to the Act which have no bearing on this dispute.

    To the same effect, the regulations pertinent to this action are those codified at 7 C.F.R. § 246.1 *et seq.* (1978).

2. Andrea Carey, for herself and as guardian *ad litem* for her daughter Leslie Bonita Rex, is the only plaintiff not in the certified class. Ms. Carey's daughter was not terminated from the WIC program under the priority program, but as the result of Ms. Carey's alleged use of abusive language to a grocery store clerk when she redeemed her WIC voucher. Ms. Carey alleges that she was provided no opportunity to be heard and, she, like the class, is suing the City defendants for their failure to provide adequate due process protections and the notice required by the statute.

3. The plaintiffs may also have been deterred from seeking further relief from the Commonwealth by the Eleventh Amendment bar to actions against the Commonwealth for damages.

4. Plaintiffs continue to argue the validity of the City's institution of the priority program, even though I have ruled that the City's decision was reasonable under the circumstances, *Alexander*

for its failure to provide the process required by the WIC statute and by the Constitution for those removed from the program under the City's institution of the priority program. On March 16, 1983, I conducted a trial on this issue. Except for the testimony of one witness, the trial consisted of the submission of stipulations relating to material, for the most part, already in the record. For this reason, I will incorporate the findings of fact and conclusions of law made in the earlier *Alexander* opinion into this opinion, and make new findings and conclusions, or reiterate existing ones, in narrative form as permitted by Fed.R.Civ.P. 52(a) and only as they relate to the remaining issue in the case.

## I. BACKGROUND

The WIC program was enacted by Congress in 1972 as an amendment to the Child Nutrition Act of 1966 to provide supplemental nutritious foods to pregnant women, infants, and young children, for whom, Congress had found, inadequate nutrition constituted a special health risk. The program was entirely federally funded and was administered by the Food and Nutrition Service (FNS) of the United States Department of Agriculture (USDA). The Secretary of Agriculture made cash grants to participating state health agencies which, in turn, contracted with local health agencies serving needy populations for delivery of benefits to eligible participants. To be eligible for benefits, an individual had to: reside within the area serviced by the local agency; have met income criteria set by the state agency; and have been found to be in nutritional need by a competent professional authority. 7 C.F.R. § 246.7(b). Only pregnant women, postpartum women, and

children under five years of age were eligible for the program. 42 U.S.C.A. § 1786(g).

In Pennsylvania, from late 1974 through February 1, 1979, the Commonwealth Department of Health administered the program state-wide and the Philadelphia Department of Public Health administered the program locally. The City operated the program as an adjunct to an existing health care program using both City health care facilities and facilities operated by subcontractors to run the program and issue food prescription vouchers to recipients. These vouchers could be used as cash to purchase prescribed foods at specified food stores.

The contract at issue in this case was between the City and the Commonwealth for the short fiscal year from October 1, 1977 to June 1, 1978. Under the contract, the Commonwealth limited the City to $300,000 in food expenditures monthly with a ceiling of $2,700,000 for that fiscal year with additional funds to cover administrative expenses. *Alexander* at 888. The contract also provided a monthly case load allocation of 15,000 which was to be used as a guideline for the expenditure of funds. If participation reached 15,000 people and additional money remained, the contract authorized the City to serve more recipients up to the maximum food money allocation.

The Commonwealth monitored vouchers cashed and informed local agencies of their expenditures. Unfortunately there was a time delay of two to six months between the issuance of vouchers in any month and a local agency's receipt of its expenditure report for that month.[5] For this reason, in November, 1977, the City conducted a manual tally of all those who had been issued food vouchers within the previous three or six months.[6] The tally showed that there were 19,666 people in this category, 4,666

---

at 897. Plaintiffs have submitted no new evidence on the reasonableness of this decision at the time it was made. My prior holding will, therefore, remain unchanged and I will discuss the correctness of instituting the priority program only as it relates to the issue of whether plaintiffs would have prevailed if due process had been provided.

**5.** Part of the reason for this delay was that vouchers could be issued for up to three months at one visit, 7 C.F.R. § 246.10(d)(7) and could remain for a significant time in the hands of each actor in the process of redemption—the recipient, the grocer, the bank.

**6.** City officials are no longer certain whether this manual tally went back for three months or for six.

more than the 15,000 monthly guideline. The City made no adjustment in this figure for people who would become ineligible—reach the age of five, move from the service area, no longer be in nutritional need, physically or financially and therefore be removed from the program; for those who only sporadically procured vouchers; or for vouchers never redeemed.

Based on this head count, and its belief that program enrollment tended to mushroom, the City feared that it would overspend its allocation if it did not implement the priority program authorized in 7 C.F.R. § 246.7(b)(2)(ii) (1978).[7] This program consisted of six categories of nutritional need which were to be served in order of priority when a local program reached its maximum participation level so that those most in need would be assured of continuing benefits.

On December 20 and 30, 1977, Dr. Pearl Pitt, City WIC Coordinator, instituted the priority program by directing local health directors and subcontractors to not only stop certifying new non-lactating postpartum women, Priority VI, and four-year-olds from Priority V (those with no medical problems), but also to remove currently enrolled recipients in these categories from the program.[8] The four-year-old cutoff was selected because Dr. Pitt felt it was unnecessary to remove all Priority V recipients in order to remain within budget limitations. Additionally, Dr. Pitt believed the risk of anemia was reduced as children grew older,[9] particularly after age three. N.T. 121 (August 8, 1978).

The Commonwealth objected to the City's implementation of the priority program and ordered the City to discontinue the program. Exhibits P–1, D–23. The City refused to comply.

When those recipients designated for termination appeared for their regularly scheduled visits, they received vouchers for the current month but were orally informed that they were going to be removed from the program. It is conceded by the City that these persons received no written notice of their impending removal and were not informed that they had a right to a fair hearing. During this period, January through November, 1978, the Commonwealth Department of Health had not published any procedures providing a hearing in accordance with the WIC regulations.

---

7. § 246.7(b)(2)(ii)

(ii) *Nutritional need.* A competent professional authority on the staff of the local agency shall determine if a person is in nutritional need through a medical or nutritional assessment. This determination may be based on data submitted by another competent professional authority. The person's height or length and weight shall be measured, and a hemoglobin or hematocrit test shall be performed if the necessary equipment for such tests is available. However, such hemoglobin or hematocrit tests are not required for infants under six months of age. The competent professional authority shall assure that those persons in greatest nutritional need are placed in the Program first. In determining a person's need for participation in the Program, the following priorities shall be applied when vacancies occur after a local agency has reached its maximum participation level:

(A) *Priority I.* Pregnant women, breastfeeding women and infants in nutritional need as demonstrated by hematological or anthropometric measurements, or other documented medical conditions which demonstrate the person's need for supplemental foods.

(B) *Priority II.* Infants (up to 6 months of age) of WIC recipients who participated during pregnancy, except for infants who qualify for Priority I.

(C) *Priority III.* Children in nutritional need as demonstrated by hematological or anthrompometric measurements or other documented medical conditions which demonstrate the child's need for supplemental foods.

(D) *Priority IV.* Pregnant women, breastfeeding women, and infants in nutritional need because of an inadequate dietary pattern, as documented by a person qualified in such assessments.

(E) *Priority V.* Children in nutritional need because of an inadequate dietary pattern, as documented by a person qualified in such assessments.

(F) *Priority VI.* Postpartum women in nutritional need.

8. The termination of non-lactating postpartum women is not at issue in this case.

9. This belief was confirmed by the later publication of the Annual Report of the National Council on Maternal, Infant and Fetal Health at 6. Exhibit D–7.

After instituting the priority program, the City did not determine how many recipients had been removed from each priority class, did not maintain a continuous count of program participants in order to compensate for the deficiencies it found in the Commonwealth's accounting system, and did not reevaluate program participation until September, 1978 when it performed another head count of the June, 1978 participation, for which the count was 15,791.[10] In October the City began keeping a monthly tally. Effective November 27, 1978, the City no longer denied WIC benefits based on the priority program. In February, 1979, the City stopped administering the WIC program.

The computer reports compiled by the Commonwealth after June, 1978 showed that the actual value of vouchers redeemed during the October 1, 1977 to June 30, 1978 contract was $2,228,335, and underspending of $471,665 for the fiscal year. It is necessary, however, to keep in mind my earlier caveat, *Alexander* at 896, that the actions involved in this litigation must be judged not with the benefit of hindsight but with the information that was available to the parties at the time the decision was made. In December, 1977, the City Health Department officials believed that if they were to exceed their budgetary allotment under the WIC program, they would not be reimbursed by the Commonwealth. City officials were aware that, because of the time delay, the Commonwealth's accounting reports could not be relied upon and that their own tally showed an unsupportable number of recipients. The City was, therefore, forced to strike a balance between currently providing services to all eligible recipients on one hand and protecting its fiscal integrity and risking the possibility of a more severe limitation of benefits in the future on the other.

Unfortunately for the intended recipients of WIC benefits, neither the City nor the Commonwealth officials charged with administering the program exercised the degree of control needed to keep expenditures as close as possible to the maximum permitted under the program. The Commonwealth failed to provide an adequate accounting system and refused to guarantee the City that, if the City complied with the Commonwealth's request that it not institute the priority program, the Commonwealth would reimburse the City for any overspending. *Alexander* at 897. City officials chose a questionable methodology for their head count and failed to monitor program participation until nine months later. With the benefit of hindsight, it is possible to argue that this inefficient management deprived eligible recipients of their benefits. Such inefficient management, however, is not illegal unless it rises to the level of unreasonable or arbitrary action. Plaintiffs have not argued[11] that the defendants' actions meet this standard and it is clear that they do not. While hindsight shows that the City may have been mistaken,[12] I decided in *Alexander* that the City's choice was permissible and reasonable at the time.

## II. STATUTORY VIOLATION

When the City Department of Health contracted with the Commonwealth to administer the WIC program, it expressly agreed to conform to the requirements of the WIC statute and the federal regulations, Exhibit D–2 at ¶ 32, but even without that agreement, the City would have been

---

10. The City has, at various times in this litigation estimated the average voucher cost to be either $17.25 or $17.85. At these rates, June's expenditures would have been between $272,394—$281,869. Both amounts were below the $300,000 per month food allocation in the contract.

11. Plaintiffs did include this allegation in their complaint, ¶ 47, but are not currently advocating this theory of recovery.

12. The City defendants still maintain that this decision was correct. They point out that they underspent by $471,665 *with* the priority program in effect and, in addition, a significant part of the $471,665 underspending was due to a four-week period in which no vouchers were available.

subject to similar compliance, 7 C.F.R. § 246.3(d); *Eder v. Beal,* 609 F.2d 695, 700 (3d Cir.1979) (Commonwealth of Pennsylvania, once it decided to participate in a Title XX program, had to act in compliance with federal law); *Budnicki v. Beal,* 450 F.Supp. 546, 550–51 (E.D.Pa.1978) (Commonwealth must conform its medical assistance program to the requirements of Title XIX of the Social Security Act).

Plaintiffs allege that the City failed to live up to that obligation because it did not provide written notification to recipients of the reasons for their termination and of their right to a fair hearing as required by 7 C.F.R. §§ 246.7(h), 246.10(c)(5)(ii) (removals for "abuse"), and 246.24(a).

The City responds that: (1) the regulations put the responsibility for notice on *either* the local or the state agency; (2) the City gave advance oral notice of termination which provided recipients with adequate time to make alternate arrangements; (3) because the Commonwealth failed in its responsibility to formulate the fair hearing procedures required by the regulations, it would have been purposeless to inform ex-recipients of their right to appeal; and (4) the regulations require notice only in cases of ineligibility, not in cases of removal.

■ The City argues that it cannot be held liable for its own failure to perform because the Commonwealth failed as well.[13] I find this argument unpersuasive. It is true that the regulations allow either the state or the local agency to provide the required written notice. Since neither one has provided that notice, I would hold both liable because only performance by one party, not failure to perform, would excuse the other. There is another factor to be considered here. It would be illogical for the City to have assumed (and for us now to assume) that the Commonwealth would be providing written notice with reasons for termination and advice of the right to a fair hearing at the same time it was ordering the City not to make those terminations. Exhibit P–1, D–23.

■ I also cannot accept defendants' argument that the provision of oral notice was adequate. The City defendants may believe that such notice is a satisfactory substitute for written notice, but the regulations require that the notice be written.

■ City defendants argue that because the Commonwealth had not established the formal hearing procedures required by the WIC regulations, 7 C.F.R. § 246.24, the provision of written notice informing the recipient of his/her right to a fair hearing would have been a hollow and meaningless gesture. I reject this argument primarily because City defendants were obligated to follow the dictates of the regulations whether or not those regulations were wise in this specific situation. Plaintiffs argue that, although the Commonwealth admitted that it had failed to provide the hearing required by the statute, the WIC State Coordinator, Mary Ann Mihok (Britton) asserted that while no formal procedure existed, the state would have provided a recipient with an adequate opportunity to be heard had any recipient made a request. Deposition 59–63 (April 26, 1979). I cannot accept this *post hoc* rationalization as fact. While the Eleventh Amendment shields the Commonwealth from liability, there is no excuse for the Commonwealth defendants having failed to fulfill their obligations under the statute.[14]

**13.** The City makes this same argument in relation to its due process responsibilities, *infra* at 617–618.

**14.** More recently in post-trial briefs, the Commonwealth and the plaintiffs cite to provisions of Pennsylvania General Rules of Administrative Practice and Procedure, 1 Pa.Code §§ 31.1 *et seq.* and 35.1 *et seq.* which provide hearing procedures for all Commonwealth agencies that have not published their own hearing procedures. This section was in effect at the time in issue. Plaintiffs and Commonwealth defendants maintain that these procedures would have provided plaintiffs with a fair hearing. Because these Code provisions were first referred to in post-trial briefs, I will not decide the applicability of these sections to the instant case.

The City defendants' argument that the regulations require due process notice and hearing only in cases of ineligibility, not in cases of removal from the program, requires closer attention than their other arguments. According to the City, "removal" results in a temporary status of *not* receiving benefits while still remaining "eligible" to receive those benefits and "ineligibility" is a permanent termination from the program. While this argument may have certain logical appeal, it is not supported by the regulations. 7 C.F.R. § 246.24,[15] which

details the fair hearing procedures, provides for hearings in a variety of cases including suspended participation. By the City's own definition, "suspended participation" was the status of the class plaintiffs, those four-year-olds removed when the priority program was instituted. City Defendants' Brief at 7. Also, § 246.10(c)(5)(ii)[16] provides for a hearing for those to be removed from the program for abuse. This was the status of the non-class plaintiff, Andrea Carey. Logic compels me to hold that if hearings were required by the regulations

**15.** § 246.24 Fair hearing procedure for recipients.

(a) Each potential recipient shall be informed of the right to a fair hearing during the initial Program certification. Whenever a person is determined to be ineligible to participate in the Program, the person shall be notified in writing of the reason for his ineligibility and his right to a fair hearing.

(b) Each State agency participating in the Program shall establish a hearing procedure under which a person, or the person's parent or guardian, can *appeal from a decision made by a local agency denying such person participation in the Program or suspending such person's participation.* If the recipient was already participating in the Program, he shall continue to receive Program · benefits until a decision is reached in the fair hearing proceedings. Such hearing procedure shall provide:

(1) A simple, publicly announced method for a person to make an oral or written request for a hearing;

(2) An opportunity for the program [sic] to be assisted or represented by an attorney or other persons;

(3) An opportunity to examine, prior to and during the hearing, the documents and records presented to support the decision under appeal;

(4) That the hearing be held within three weeks from the date of receipt of request, be convenient to the person, and that a minimum of ten days written notice be given to the person as to the time and place of the hearing;

(5) An opportunity for the person or his representative to present oral or documentary evidence and arguments supporting his position in accordance with procedures established by the hearing official, and that such procedures shall not be unduly complex or legalistic, and shall take into consideration the person's background and education;

(6) An opportunity for the person or his representative to question or refute any testimony or other evidence and to confront and cross-examine any adverse witnesses;

(7) That the hearing be conducted and the decision made by a hearing official who did not participate in making the decision under appeal or in any previously held conferences;

(8) That the decision of the hearing official be based on the oral and documentary evidence presented at the hearing and that such decision be made a part of the hearing record;

(9) That the person, and any designated representative, be notified in writing of the decision of the hearing official within 45 days from the date of the request for hearing;

(10) That a written record be prepared with respect to each hearing, which shall include the decision under appeal, any documentary evidence admitted and a summary or verbatim transcript of any oral testimony presented at the hearing, the decision of the hearing official, including the reasons therefor, and a copy of the notification to the family concerned of the decision of the hearing official; and

(11) That such written records of each hearing be preserved for a period of three years and be available for examination by the person, or his representative, at any reasonable time and place during such period. (Emphasis added)

**16.** § 246.10(c)(5)(ii)

The State agency shall establish procedures designed to control recipient abuse of the Program. Recipient abuse includes, but is not limited to, sale of supplemental foods or food instruments to (or exchange with) other individuals or entities and receipt from food vendors of cash or credit toward purchase of unauthorized food, or other items of value in lieu of authorized food. The State agency shall establish sanctions for recipient abuse. Such sanctions may, at the State agency's discretion, include suspension or removal from the Program. Warnings may be given prior to the imposition of sanctions. Before a recipient is suspended or removed from the Program for alleged abuse, that recipient shall be given full opportunity to appeal a suspension or removal as set forth in § 246.24.

This section is included in a delineation of the State Agency's responsibilities. However, since the City defendants effected the removal here, they would be governed by the same standard.

in these situations, notification of the right to a hearing was also mandatory.

In summary the City violated the WIC regulations by failing to provide written notice of the termination of benefits and of the recipient's right to a hearing to those removed by the institution of the priority program.

■ The City did inform Andrea Carey of her termination by letter. This letter is not in the record, but Ms. Carey has testified that she received it. N.T. 10–11 (March 16, 1983). The City maintains that the letter offered Ms. Carey the opportunity to discuss her termination with the writer, Mr. Barry Dickman, the Administrator of the WIC program. Exhibit S–27. This letter, however, did not notify Ms. Carey of her right to a fair hearing conforming to the requirements of 7 C.F.R. § 246.24(b)7, particularly her right to a hearing officer other than the original decision-maker. Therefore, there has been a statutory violation in Ms. Carey's case as well.

## III. DUE PROCESS

In order to determine if there has been a violation of due process, I must engage in a two-part analysis. First, for the due process protections of the Fourteenth Amendment to apply, plaintiffs must have a "property" interest in WIC benefits. Second, if there is a property interest, I must determine what process is constitutionally due to protect it. *Morrissey v. Brewer,* 408 U.S. 471, 481–3, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484 (1972).

The City argues that plaintiffs had no property interest in these benefits because: 1) WIC funds were limited, and plaintiffs, therefore, had only a unilateral expectation of continued benefits; and 2) the evaluations of nutritional need required for removals under the priority program were made by a "competent professional authority," 7 C.F.R. § 246.7, and involved "subjec-

tive" factors which were not appropriate for review. Plaintiffs argue that WIC benefits are like other public welfare benefits. The law is well settled that the intended recipients of such benefits have a property interest.

■ "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). One must look at both the "weight" of the interest, *i.e.,* the extent to which an individual will be condemned to suffer grievous loss if the benefit is denied, and whether the "nature" of the interest is one within the contemplation of the liberty or property language of the Fourteenth Amendment in determining whether due process requirements apply. *Morrissey* 408 U.S. at 481, 92 S.Ct. at 2600. I must examine the parties' contentions within this framework.

Plaintiffs' comparison of WIC benefits to other welfare benefits where the courts have found due process guarantees to apply [17] is inaccurate in two respects. First, as defendants argue, the WIC program is not open-ended. There is a limitation on the number of eligible recipients the program will serve. Defendants cite *Ingram v. O'Bannon,* 534 F.Supp. 385 (E.D.Pa.1982), to support the argument that this limitation negates a property interest. A similar fact situation existed in that case which dealt with the Pennsylvania Homemaker Services Program funded under the federal Social Services Block Grant Act. Two groups of plaintiffs claimed a due process violation, those who had been recently removed from the program because of a reduction in funding and those eligible to receive the service who had been placed on a waiting list until

---

**17.** *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (Social Security Disability Benefits); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (Aid to Families with Dependent Children Benefits);

*Budnicki v. Beal,* 450 F.Supp. 546 (E.D.Pa.1978) (Medical Assistance); *Buckles v. Weinberger,* 398 F.Supp. 931 (E.D.Pa.1975) (Supplemental Security Income).

a homemaker became available. In relation to the first group, who were like the plaintiffs in the instant case, the court held:

> ... the regulations do not create an entitlement to the service or at most, create an entitlement to receive the service as it is available. The service *as defined* includes the use of waiting lists.... This regulations [sic] negates any allegation that when demand surpasses availability, applicants have a legitimate expectation that the state will increase funding of the program to ensure that all applicants received the service. Nothing in the state regulations can be construed to create the expectation that the applicant-plaintiffs claim to have. Thus, their expectation is truly unilateral and is not protected by the due process clause. *Id.* at 389.

■ It is significant to note, however, that the plaintiffs in *Ingram* were claiming an absolute right to benefits, while plaintiffs here claim a right only as funding is available. Also, *Ingram*'s plaintiffs had already been given an opportunity to appeal, a hearing, and had been referred to other agencies for provision of substitute services. In this regard, *Ingram*'s plaintiffs had already received what plaintiffs here seek. Consequently, I do not find the limitation of funding dispositive of the property interest issue.

■ The second distinction between WIC and these other welfare benefits, is that while WIC is a need-based program, it is a supplemental program serving needs somewhat less pressing than the life-sustaining assistance provided by general relief payments for example. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ Despite these differences, however, I find the plaintiffs interest in WIC benefits to be substantial and of the type usually protected by due process. The mandatory language of the statute [18] enacting the WIC program also supports this conclusion.

■ The City defendants argue that because the determinations of nutritional need required for removals under the priority program were made by medical personnel or other professionals, they were subjective and capable of differing evaluations. Therefore, these determinations were not amenable to review by any type of process [19] and consequently not a protectable property interest. I disagree with this argument because a review of such decisions would have allowed for identification of errors. More importantly, when the priority program was instituted, it did not involve the kind of individualized evaluations to which defendants have referred.

■ In addition, I point out that two examples of terminations have surfaced in this litigation which do not fit within the City's termination for lack-of-nutritional-

**18.** 42 U.S.C. § 1786(b)(1)

During ... the fiscal year ending September 30, 1978, the Secretary *shall* make cash grants to the health department or comparable agency of each State ... to enable such agencies to carry out health and nutrition programs under which supplemental foods *will be* made available to pregnant or lactating women and to infants determined by competent professionals to be nutritional risks because of inadequate nutrition and inadequate income, in order to improve their health status. (Emphasis added)

Section 1786(c) authorized an appropriation for the fiscal year ending September 30, 1978 not to exceed $250,000,000.

**19.** Defendants have cited several cases from the parole/pardon area in support of this position. I find these cases inapposite. In *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981), the Court held that there was no "liberty" in-

terest in the commutation of life sentences. Applications for commutation were only appeals for clemency, "simply a unilateral hope." *Id.* at 465, 101 S.Ct. at 2462. The Court found that the Connecticut statute had provided the Board of Pardons with "unfettered discretion." In *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Court found that discretionary parole was a mere hope and the decision whether or not to grant parole did not involve fact issues, but the Board members' subjective predictions of the applicant's future behavior. The decisions concerning nutritional need made in the instant case did not involve the exercise of unfettered discretion and were not based upon subjective predictions. In addition, the plaintiffs' right to WIC benefits cannot be characterized as a mere hope.

need category. Andrea Carey was removed from the WIC program because she allegedly used abusive language to a participating grocery store clerk. The City does not argue that due process protections would have been meaningless in Ms. Carey's case. A more serious situation was that of Leon Truitt, a four year old child with a medical problem when the City instituted the priority program. The City's guidelines said that four-year-olds with medical problems were *not* to be denied WIC benefits. However, because of a misinterpretation of this policy by the director of a subcontracting agency, Leon was removed from the program and was never reinstated. N.T. 82, 95–97 (September 5, 1978). Clearly, if due process had been provided, the error in removing Leon Truitt could have been corrected.

Because I find that plaintiffs had a legitimate claim of entitlement to WIC benefits to the extent that they were available and within the guidelines established by the regulations, I hold that plaintiffs had a property interest in these benefits. Having determined that there was a property interest in WIC benefits, I come to the second prong of the due process analysis, the determination of what process is due.

■ The City defendants raise two arguments against this court's holding that they had any due process responsibilities toward plaintiffs. The City argues first that no due process was provided in relation to its decision to institute the priority program because this was a policy decision which could have been challenged only in the courts. Brief at 21. Defendants' argument would be more persuasive in the context of the *Ingram* case, *supra,* in which the decisionmaker was determining how funds would be allocated. In the instant case, the allocation had already been made and the criteria for the institution of the priority program established by the regulations. The only question was whether those criteria existed, whether the factual predicate

for the institution of priorities had been met. This was a determination appropriate for review. While pre-removal individual hearings may not have been an appropriate form of process to examine this issue, that fact does not indicate that no process was due or that no meaningful process could have been provided to resolve this issue. *See, Budnicki v. Beal,* 450 F.Supp. 546, 554 (E.D.Pa.1978) (discussion of fact/law distinction in due process cases). There was, in addition, a second factual issue in each case: Whether the individual recipient was appropriately removed under the priority program. If due process had been provided, Leon Truitt would not have been incorrectly removed from the program.

■ Secondly, the City defendants argue that, according to the WIC regulations, 7 C.F.R. § 246.24, it is the Commonwealth's responsibility to provide hearings and the City is thereby absolved of this responsibility. They argue further that it would be inappropriate for the court to reallocate the responsibilities allocated by Congress. The City, as the governmental body administering the award and termination of plaintiffs' benefits was under a duty to adhere to the requirements of the due process clause independent of any statutory requirements.[20] There is also a logical inconsistency in the City's demanding to make its own decision as to when the priority program was to be instituted, and its willingness to rely on the Commonwealth to provide the mechanism through which the correctness of that decision could have been challenged.

In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court listed three factors to be considered in determining if the process provided is constitutionally sufficient: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation through the procedures used and the probable value, if any, of additional or alterna-

---

**20.** Quite probably, had the Commonwealth provided the notice and hearings required by the regulations, the City would have met its due process obligations merely by cooperating with the Commonwealth system. Due process would not mandate duplication. However, the Commonwealth failed to provide what the regulations required and the City cannot shield its own failure with that of the Commonwealth.

tive. procedural safeguards; and (3) the government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Id.* at 334–5, 96 S.Ct. at 902–03.

In the instant case, it is unnecessary, for several reasons, to engage in this extended analysis[21] to determine the scope of the due process protections needed. First, the City stopped removing recipients under the priority program in November 1978 and discontinued administering the WIC program in January 1979. It is, therefore, unnecessary to determine the process that must be provided by City defendants in the future.[22] Secondly, the City provided *no* due process protections to class plaintiffs other than oral notification that they would be removed from the program. It is obvious that this process was inadequate and the violation of the due process clause is clear.

Andrea Carey's termination from the WIC program was accomplished by letter. Although the letter did contain a statement that Ms. Carey could call defendant Dickman if she had any questions, it made no offer to provide her with an opportunity to challenge· the factual and legal basis for her removal. The City's treatment of Ms. Carey was a violation of due process.

## IV. REMEDY

Having determined that the City defendants violated plaintiffs' due process rights and the WIC statute,[23] I must

determine the appropriate remedy. In order for the City to be liable under 42 U.S.C. § 1983, the violations of plaintiffs' rights must have occurred pursuant to a City policy or custom. *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs contend that the decision to implement the priority program and to provide only oral notice were City policies. The City does not contest this characterization and I find that these two decisions constitute "policies" for § 1983 purposes.

In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Court held that for violations of due process rights, plaintiffs were entitled to only nominal damages unless they were able to show that the deprivation caused actual injury. In other words, if the plaintiffs would not have prevailed even if the proper process had been provided, then the deprivation of due process caused no injury and there could be no recovery. *Id.* at 260, 98 S.Ct. at 1050. The issue in this case therefore is whether plaintiffs would have prevailed if they had received written notice and a hearing.

### Class Plaintiffs

Plaintiffs contend that had the proper notice and hearings been provided, they would have successfully challenged the City's institution of the priority program for four-year-olds and the removed four-year-old plaintiffs would have been reinstated and would have continued to collect benefits until their fifth birthdays. Plaintiffs now seek retroactive payment of these benefits. The City defendants argue that it

---

**21.** If I were to engage in such an analysis, the statute establishing the WIC program, 42 U.S.C. § 1786, and the regulations promulgated thereunder, 7 C.F.R. § 246.1, *et seq.,* which mandate written notice and pre-termination hearing, would be given substantial weight, as would the regulations' allocation of those responsibilities between the City and the Commonwealth.

**22.** In addition, during the pendency of this litigation, the Commonwealth of Pennsylvania has promulgated guidelines for notice and hearing in accordance with the WIC regulations in 7 C.F.R. § 246.24.

**23.** Because the statutory violation in this case, the City's failure to provide written notice of the reasons for termination and of recipients' rights to a hearing, is encompassed by the due process violation, I will apply the same standard in determining the remedy for both violations.

The City's violation of the statutory requirement to continue benefits during the notice and hearing process, 7 C.F.R. § 246.24(b), does have an impact on the remedy different from the effect of the due process violation. This impact is discussed later in this section.

is illogical for plaintiffs to maintain that they would have prevailed on the priority issue at an administrative hearing when this court has determined that instituting the priority program was reasonable. *Alexander* at 897.

Plaintiffs' position is not without logic. The administrative hearing would have been provided, according to the parties' interpretation of the regulations, by the state agency and the Commonwealth had previously indicated its disagreement with the City's decision to implement the priority program. *See* Exhibit P–1, D–23. Thus, argue plaintiffs, with the Commonwealth as the decisionmaker, they would have prevailed. I will, for the sake of argument, assume that plaintiffs are correct and that the Commonwealth would have decided that the City was wrong in instituting the priority program. It is possible that, based on such an administrative decision, the City would have reinstated removed recipients. This is an unlikely scenario, however, because a similar situation actually existed just before and during the early part of this litigation. The Commonwealth had considered the City's decision to implement the priority program, disapproved it, attempted to reassure the City that it would suffer no fiscal liability for reinstating removed recipients, *See* Exhibit P–1, and ordered the City to cease the priority program. The City refused to comply and the Commonwealth was either powerless to enforce, or unconcerned with enforcing, compliance. There is no convincing reason to believe the City would have acted differently after a Commonwealth administrative hearing. Such a hearing would, in all probability have produced nothing more than has existed throughout the entire course of this litigation—a conflict between the City and the Commonwealth about the appropriateness of implementing the priority program. Thus, while plaintiffs may have been said to have prevailed at the administrative hearing, it is unlikely that the City would have reinstated them without a guarantee by the Commonwealth to reimburse the City for all cost overruns associated with abandoning the priority program. This is the guarantee the City continually sought and the Commonwealth continually refused to provide.

There are, of course, other possible outcomes of such an administrative hearing: the Commonwealth might have provided contractual guarantees to the City to protect it from fiscal liability; the Commonwealth might have improved its accounting system; the City might have eliminated the problems with its head count tally and maintained its manual monitoring system; or the City and the Commonwealth might have agreed on a method for reconciling the differences in their accounting systems so that they would both be making decisions based on the same facts. Any of these outcomes would have been beneficial to plaintiffs. However, because I have no reason to believe that any of these alternatives was likely to have occurred, it would be inappropriate to fashion relief on any such speculative outcome.

What is not speculative, however, is the provision of the WIC regulations, 7 C.F.R. § 246.24(b), which required that benefits be paid during the hearing process. According to this section, the hearing process had to be completed within 45 days from the request for a hearing. The plaintiffs have failed to provide any evidence of the time in which the Commonwealth would have rendered a decision. The City provided benefits for 30 days after its oral notice of termination. I cannot assume that the Commonwealth would have needed more than that 30 days to reach a decision for two reasons. First it would be too speculative to make such an assumption in light of the plaintiffs' failure to carry their burden of proof. Secondly, because the Commonwealth was aware of the City's decision to implement the priority program as early as mid-December, 1977, Exhibit D–6, it is more reasonable to assume that a decision could have been rendered promptly.

Because no actual damages have been proved, I hold that plaintiffs class will re-

cover only nominal damages in the amount of one dollar.[24]

*Leon Truitt*

██ I have held that Leon Truitt was incorrectly removed from the program in April 1978. Had Leon been provided with due process or the statutory notice and hearing, this obvious error would have been identified and corrected. Leon is, therefore, entitled to actual damages for his injury. Unfortunately, plaintiff has not provided any evidence of the measure of Leon's damages, but argued instead that WIC benefits are fungible with cash and, because Leon did not receive benefits for five months, he is entitled to the equivalent in dollars. City defendants argue in opposition that Leon was deprived of nutritional sustenance and the appropriate award is the resumption of benefits. Because of the difficulties with the City defendants' approach, which are discussed later in this section, it is impossible to provide in-kind benefits to Leon. I must then determine the value of Leon's WIC benefit. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) directs that damages for constitutional violations be determined according to tort principles. To the extent possible, the court is to be guided by the common law tort most analogous to the constitutional violation. *Id.* at 258, 98 S.Ct. at 1049. The deprivation of due process and the statutory violation which led to the withholding of Leon's benefits is similar to common law conversion, for which, according to Pennsylvania law, the measure of damages is the market value of the goods at the time and place of conversion. *Knuth, et al. v. Erie-Crawford Dairy Cooperative Association, et al.*, 463 F.2d 470, 478 (3d Cir.1972), *cert. denied*, 410 U.S. 913, 93

S.Ct. 966, 35 L.Ed.2d 278 (1973). The most reasonable measure of that value is the amount the state paid for Leon's vouchers each month. Leon is entitled to the value of his monthly benefits [25] from the date of his removal, April 1978, until he reached his fifth birthday in September 1978. No evidence has been provided that Leon suffered any further damage from his precipitous removal.

No evidence has been provided for any of the other named plaintiffs that would support a finding that they would have prevailed if they had been provided with notice and hearing. *See* the discussion in *Alexander* at 894–5.

*Andrea Carey*

██ I have also held that Andrea Carey was deprived of her due process rights and the statutory process required by 7 C.F.R. § 246.10(c)(5)(ii). Ms. Carey does not claim damages for deprivation of benefits for her daughter, Leslie Bonita Rex, because Leslie was reinstated within the same month in which she was removed and, although some benefits were delayed, she did not miss receiving any vouchers. Ms. Carey's claim is for the emotional distress caused by the City's denying her an opportunity to present her side of the story. While I find that plaintiff experienced justifiable displeasure with the City's actions, I do not find that her distress rose to a compensable level.[26] Ms. Carey is, therefore, entitled only to nominal damages.

██ Plaintiffs also seek punitive damages. The City defendants correctly point out that such relief against the City is barred. *City of Newport v. Fact Concerts,*

---

**24.** Because I have denied relief, other than nominal damages, due to plaintiffs' failure of proof, I need not address, at this juncture, the question of the appropriate means of measuring the damage caused by the deprivation of benefits.

**25.** The specific amount of Leon's benefit is not in evidence. The City has at various times in this litigation estimated that the average WIC monthly benefit was either $17.25 or $17.85. I assume that the value of the benefits provided increased during the December, 1977 to Octo-

ber, 1978 period. I will use the $17.55 average in determining Leon's damages.

**26.** The plaintiff has cited several state law cases to support a "significant" award, $250–$750, for plaintiff's emotional distress. In all these cases, however, the award was compensation for the humiliation plaintiffs suffered because of racial or sexual discrimination. There is no evidence of such discrimination in this case, nor proof of injury rising to the level of that found in these cited cases.

*Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Punitive damages, however, are available against the individual defendants. *Id.* at 269, 101 S.Ct. at 2761. In a recent decision, *Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court defined the standard to be used for awarding punitive damages in § 1983 cases. If a defendant shows a "reckless or callous indifference to the federally protected rights of others," punitive damages may be awarded. *Id.* at ——, 103 S.Ct. at 1640. There has been no evidence that the actions of any defendant demonstrates such recklessness or callousness. Punitive damages will therefore be denied.

■ The City asserts that the assessment of any damages against individual defendants [27] is barred by qualified immunity. While there is no qualified immunity for the City or for municipal officials acting in their official capacity, there is a qualified immunity for these officials in their personal capacity. *Owen v. City of Independence, Missouri,* 445 U.S. 622, 623, 657, 100 S.Ct. 1398, 1401, 1418, 63 L.Ed.2d 673, *reh'g denied,* 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980). In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court modified the test to be used in determining if an official's actions are immune from suit under the qualified immunity doctrine. Prior to that case, defendants' conduct was measured against both an "objective" and a "subjective" standard. *Harlow* 102 S.Ct. at 2737. The test now is whether defendants' conduct violated "clearly established" statutory or constitutional rights of which a reasonable person would have been aware. *Id.* 102 S.Ct. at 2738–39.

■ As well as this court has been able to ascertain, the issue of entitlement under the WIC program and the interpretation of the WIC regulation's notice requirements relating to removals under the priority program were issues of first impression in the instant litigation. In addition, the length of this opinion also supports the conclusion that the rights involved were not "clearly established." I therefore hold that all individual City defendants are protected by qualified immunity from liability in their personal capacities for denial of due process and statutory notice to class members.

■ Andrea Carey's situation is different. The right to a pre-removal hearing in cases of alleged program abuse was clearly spelled out in the regulations, 7 C.F.R. § 246.10(c)(5)(ii). Mr. Dickman's original letter to Ms. Carey informing her of her removal from the WIC program, offered her the opportunity to discuss her situation with him. Because of the Commonwealth's failure to provide hearing procedures that Mr. Dickman could have used, his action may have been an attempt to offer some process in this case. In addition, very shortly after Ms. Carey's attorney informed Mr. Dickman of the procedural defects in the handling of Ms. Carey's case, her daughter's benefits were reinstated and she was offered the opportunity for a fair hearing, Exhibit S–28. Defendant Jack Burkhardt became involved in this incident when he sent a letter affirming Mr. Dickman's original actions to Andrea Carey's attorney. Exhibit S–27. The day after Mr. Burkhardt sent his letter, however, Mr. Dickman sent his letter to Ms. Carey informing her of her daughter's reinstatement. Under these circumstances, it would be unreasonable to abrogate Mr. Dickman's or Mr. Burkhardt's "good faith" immunity.

■ There is one last issue to be addressed. I have determined the amount of damages to which plaintiffs are entitled, but not the means of providing relief. The City argues that the purpose of the WIC program is to provide nutritional assistance, therefore, providing plaintiffs with monetary compensation at this point in time would not achieve the statutory purpose. In addition, the City argues that since it no

---

**27.** No evidence has been presented against City defendants Louis Polk, M.D. and David Soricelli, D.D.S. A § 1983 action will not lie against them solely for their supervisory role. *Monell*

*v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). I will therefore enter judgment for these defendants.

longer administers the WIC program, it can provide no compensation in the form of vouchers or reinstatement. Lastly, the City argues that the food benefits of which plaintiffs were deprived were paid for by federal funds and exacting monetary damages from the City at this point would be improper.

The plaintiffs maintain, simply, that since a violation has been found, a remedy must be provided. They argue that there is nothing in the WIC statute which would block monetary payments. To support the argument that they should be compensated for the loss of nutritional benefits, plaintiffs rely on an analogy to cases which involved the improper deprivation of food stamps.[28] In these cases, because the courts were concerned about the potential for abuse if extra stamps were provided as damage payments, i.e., the sale of the stamps, they fashioned the remedy of "forward adjustment," which reduced or eliminated the cost of future stamps to plaintiffs until they had received compensation for their injuries. While a remedy of this type would not be appropriate here,[29] the rationale supporting the court's decision to compensate plaintiffs in *Carter v. Butz,* 479 F.2d 1084, 1088 (3d Cir.1973), *cert. denied,* 414 U.S. 1094, 94 S.Ct. 727, 38 L.Ed.2d 552 (1973), is applicable. The court held that while plaintiffs' past food consumption could not be increased to compensate for the nutritional loss they had suffered, they could be compensated for the fiscal loss that accompanied the denial of stamps. The court found it likely that plaintiffs would have used their own money which would otherwise have been allocated for other purposes to fill the nutritional void. This fiscal deprivation was appropriately compensated by money damages. Applying the same logic,

I find no reason to withhold monetary damages.

City defendants, relying on *Carter v. Butz,* argue that if monetary damages are to be awarded for benefits any plaintiffs should have received, the federal government should pay those damages. They argue that federal money would have paid those benefits originally and that during the relevant period, the Commonwealth refunded $1,663,216 in unspent WIC allocations to the federal government. Stipulation 43. In *Carter,* the court held that the federal government had to reimburse recipients for food stamp benefits incorrectly withheld because of a state error. There are however two significant differences between the situation in that case and the one here. First, plaintiffs in *Carter* were currently receiving food stamps from the federal government and the forward adjustment remedy could be easily applied. Second, and more important, the federal government was a defendant in that case. The absence of these factors in the instant case make a remedy against the federal government untenable.

The City defendants' position is somewhat anomalous. They are not solely responsible for the injury to plaintiffs, but because the Eleventh Amendment bars recovery against their co-actors, the Commonwealth defendants, they will bear the full, albeit *de minimus,* cost of compensating plaintiffs. Had the City continued to pay benefits in 1978, the funds would have been provided by the federal government. The money must now be provided by the City. We must keep in mind, however, that the City is most directly responsible for the harm to plaintiffs. Because it was the City defendants who decided what process to provide to those removed, under the circumstances, there is no injustice in holding the

---

**28.** *Bermudez v. U.S. Department of Agriculture,* 490 F.2d 718 (D.C.Cir.1973), *cert. denied,* 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); *Carter v. Butz,* 479 F.2d 1084 (3d Cir. 1973), *cert. denied,* 414 U.S. 1094, 94 S.Ct. 727, 38 L.Ed.2d 552 (1973).

**29.** This remedy is inappropriate here because: 1) no plaintiffs are still eligible to receive bene-

fits under the WIC program as they are all well over five years of age; 2) the cost of benefits to recipients cannot be reduced because there is *no* charge to recipients in the WIC program; and 3) no evidence has been presented of abuse or potential abuse of WIC program vouchers necessitating such a remedy.

City defendants liable for the harm caused by their actions.

## ORDER

This 29th day of September, 1983, it is

ORDERED that Judgment is entered in favor of all plaintiffs and against defendants, the Department of Health of the City of Philadelphia, Pearl Pitt, M.D., Christine Kniszley, M.D., Barry Dickman, and Jack Burkhardt, in their official capacities in the following amounts:

| | |
|---|---|
| Plaintiff, Leon Truitt—Compensatory damages of | $87.75; |
| All Class Plaintiffs—Nominal damages of | 1.00; |
| Plaintiff, Andrea Carey—Nominal damages of | 1.00; |
| for Total Damages of | $89.75 |

for which these defendants are jointly and severally liable; it is

FURTHER ORDERED that Judgment is entered in favor of defendants Louis Polk, M.D. and David Soricelli, D.D.S.; and it is

FURTHER ORDERED that plaintiffs' claim for injunctive relief against the Department of Health of the Commonwealth of Pennsylvania, Leonard Bachman, M.D., and Mary Ann Britton (Mihok), R.D. is DISMISSED as moot; and that plaintiffs' claim against these defendants for monetary damages is DISMISSED as barred by the Eleventh Amendment.